**SUMMONS - CIVIL**
JD-CV-1   Rev. 2-22
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| For information on ADA accommodations, contact a court clerk or go to: *www.jud.ct.gov/ADA*. |
|---|

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*



**Instructions are on page 2.**

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.

☐ Select if claiming other relief in addition to, or in place of, money or damages.

**TO: Any proper officer**

By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk *(Number, street, town and zip code)* | Telephone number of clerk | Return Date *(Must be a Tuesday)* |
|---|---|---|
| **123 Hoyt Street, Stamford, CT 06905** | ( 203 ) 965 – 5308 | **August 9, 2022** |

| ☒ Judicial District | G.A. | At *(City/Town)* | Case type code *(See list on page 2)* | |
|---|---|---|---|---|
| ☐ Housing Session ☐ Number: | | **Stamford** | Major: **C** | Minor: **20** |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(if attorney or law firm)* |
|---|---|
| **Shipman & Goodwin LLP, 300 Atlantic Street, Third Floor, Stamford, CT 06901** | **412577** |

| Telephone number | Signature of plaintiff *(if self-represented)* |
|---|---|
| ( 203 ) 324 – 8100 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. | ☒ Yes ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book *(if agreed)* azeitlin@goodwin.com |
|---|---|---|

| Parties | Name *(Last, First, Middle Initial)* and address of each party *(Number; street; P.O. Box; town; state; zip; country, if not USA)* | |
|---|---|---|
| **First plaintiff** | Name: **Gartner, Inc.** <br> Address: **56 Top Gallant Road, Stamford, CT 06902** | P-01 |
| **Additional plaintiff** | Name: <br> Address: | P-02 |
| **First defendant** | Name: **Aon/Albert G. Ruben Insurance Services, Inc.** <br> Address: **200 E. Randolph Street, Chicago, IL 60601-6436** | D-01 |
| **Additional defendant** | Name: <br> Address: | D-02 |
| **Additional defendant** | Name: <br> Address: | D-03 |
| **Additional defendant** | Name: <br> Address: | D-04 |

| Total number of plaintiffs: 1 | Total number of defendants: 1 | ☐ Form JD-CV-2 attached for additional parties |
|---|---|---|

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the court at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
   **The court staff is not allowed to give advice on legal matters.**

| Date | Signed *(Sign and select proper box)* | ☒ Commissioner of Superior Court | Name of person signing |
|---|---|---|---|
| **July 12, 2022** | | ☐ _____ Clerk | **Andrew M. Zeitlin** |

| If this summons is signed by a Clerk: | For Court Use Only |
|---|---|
| a. The signing has been done so that the plaintiff(s) will not be denied access to the courts. <br> b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law. <br> c. The court staff is not permitted to give any legal advice in connection with any lawsuit. <br> d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint. | File Date |

| I certify I have read and understand the above: | Signed *(Self-represented plaintiff)* | Date | Docket Number |
|---|---|---|---|

RETURN DATE: AUGUST 9, 2022       :      SUPERIOR COURT

                                       :

GARTNER, INC.,                      :      JUDICIAL DISTRICT OF STAMFORD

                                         :      AT STAMFORD

        Plaintiff,                :

                                         :

v.                                          :

                                         :

AON/ALBERT G. RUBEN INSURANCE    :

SERVICES, INC.,                      :

                                         :

        Defendant.             :      JULY 12, 2022

## **COMPLAINT**

     Plaintiff Gartner, Inc. ("Gartner"), by and through its undersigned counsel, for its

Complaint against Defendant Aon/Albert G. Ruben Insurance Services, Inc. ("Aon"), hereby

alleges, on knowledge as to its own conduct and otherwise upon information and belief, as

follows:

### **SUMMARY OF ACTION**

1.      In related litigation pending in United States District Court for the Southern District of

     New York, Gartner is pursuing claims against U.S. Specialty Insurance Company

     ("USSIC") and HCC Specialty Underwriters, Inc. ("Specialty") for breach of event

     cancellation insurance policies and additional extra-contractual claims (the "USSIC

     Litigation"). These claims arise from USSIC's and Specialty's refusal to cover

     significant portions of Gartner's losses sustained when Covid-19 caused cancellations in

     Gartner's worldwide conference and event business.

2.      There are two policies (the "Policies") at issue in the USSIC Litigation: (a) a two-year

     policy (the "Destination Policy") covering Gartner's larger shows that was in effect for

     2020 and 2021 with an annual aggregate limit of $150,000,000; and (b) another policy

1

(the "Evanta Policy") covering the cancellation of different, smaller events from June 2019 through December 2020, which had an aggregate limit of $20,000,000. Both Policies contain an additional provision requiring USSIC, at Gartner's "sole option" and upon the payment of a predetermined additional premium, to "reinstate" the aggregate limits of each policy. The effect of this reinstatement provision, as explained to Gartner by Aon, was to allow Gartner to double the initial annual aggregate limits and provide Gartner up to $150,000,000 in additional coverage for each year of the two-year Destination Policy and $20,000,000 in additional coverage under the Evanta Policy.

3.      Aon was Gartner's broker for the Policies. It had (and has) expertise with the types of policies at issue in the USSIC Litigation (and held itself out as having such expertise) and fully understood the coverage required by Gartner.

4.      Based on its expertise and understanding of Gartner's requirements, Aon provided a coverage option to Gartner for a policy that contained a provision for the full reinstatement of the policy's initial aggregate limit, in lieu of other options with different policy limits but without the reinstatement of limits clause. Based on Aon's assurances about reinstatement of the full limits, Gartner chose this option.

5.      Aon negotiated, reviewed, and approved the language in the Policies providing for reinstatement of the full policy limits, procured the Policies on Gartner's behalf, and assured Gartner that reinstatement would be available, if necessary, to double the Policies' initial aggregate limits to cover any show if the initial aggregate limits were exhausted. Gartner relied on Aon's advice and representations when selecting what event cancellation coverage to purchase.

6.     As Gartner began to suffer devastating financial losses from the Covid-19-related
cancellations of its events, it demanded reinstatement of the Policies' aggregate limits.
USSIC and Specialty have refused to do so.  Among other things, they have taken the
position in the USSIC Litigation that the Policies' reinstatement of limits clause does not
permit reinstatement of any portion of the aggregate limits and the total limit can never
exceed the initial aggregate limit stated in the declarations. In addition, USSIC contends
that only the limit for a cancelled show may be reinstated, and that the reinstated limit
could only be used if a cancelled show was rescheduled so as to take place on a
subsequent date during the same calendar year and then suffered a second loss.  Given the
lead time required for Gartner to plan and stage these events, the interpretation of the
reinstatement provision offered by USSIC and Specialty would render the provision
essentially meaningless.

7.     When USSIC and Specialty refused to honor Gartner's demand to reinstate the Policies'
limits, Gartner suffered enormous financial loss.  Gartner has filed claims against USSIC
and Specialty in the USSIC Litigation to recover that loss.  But if the Policies negotiated,
approved and procured by Aon do not provide for reinstatement of the aggregate limits,
as Aon represented to Gartner that they would, then Aon is liable to Gartner for its losses.
Gartner therefore brings this action against Aon for breach of contract, negligence,
negligent misrepresentation, and breach of fiduciary duty to recover those losses.

## PARTIES AND VENUE

8.     Plaintiff Gartner, Inc. (formerly known as the Gartner Group, Inc.) is a publicly-traded
global research and advisory firm incorporated in Delaware with its principal place of
business in Stamford, Connecticut.  Gartner hosts conferences and events worldwide
connecting leaders in information technology, finance, human resources, customer

service and support, legal and compliance, marketing, sales, and supply chain functions. These events also serve as a venue to demonstrate the value of Gartner's research and advisory subscription services to clients and potential clients.

9.      Defendant Aon is a California corporation, with its headquarters in Chicago, Illinois.  It specializes in insurance coverage for the entertainment industry, including event cancellation insurance, and has done so for many years.

10.     Venue is proper in this Court under Connecticut General Statutes § 51-345(c)(2), as Gartner has its principal place of business in this judicial district and suffered damages in this judicial district, and some of the transactions described below occurred in this judicial district.

## FACTS

11.     In recent years, Gartner has hosted upwards of 60-70 "destination" conferences and events (large, multi-day conferences, referred to in the policies as "shows") for business professionals held annually in cities across the globe (the "Destination Shows").  These events draw international attendees, exhibitors, and speakers.  In or around 2017, Gartner acquired the Evanta line of conferences (the "Evanta Shows"), which were smaller than the Destination Shows.

12.     In addition to being profitable in their own right, both the Destination Shows and the Evanta Shows enhance Gartner's brand and help to cross-sell other Gartner services. Therefore Gartner has long insured against losses that may result from the cancellation of its events.

13.     Aon procured two Policies on Gartner's behalf that are the subject of this lawsuit: (i) the Destination Policy covering the Destination Shows, including those shows Gartner was forced to cancel in 2020 and 2021 because of the pandemic; and (ii) the Evanta Policy

covering the Evanta Shows, including those shows Gartner was forced to cancel in 2020
because of the pandemic.

14.     Both Policies expressly provide coverage for losses due to communicable disease,
stating:

> COMMUNICABLE DISEASE – This insurance is to indemnify
> the insured for any loss, damage, cost or expense of whatsoever
> nature directly or indirectly caused by, resulting from or in
> connection with any outbreak of communicable disease (whether
> actual or perceived) regardless of any other cause contributing
> concurrently or in any sequence to the loss.

In addition, both Policies provide for the reinstatement of the full limits of liability at

Gartner's sole option if the limits are eroded or exhausted by any potential or actual

payment of losses.

### *Evolution of the Destination Policy Brokered and Negotiated by Aon*

15.     Prior to late-2007, Gartner had event cancellation coverage under a policy issued by

various Lloyd's syndicates (the "Lloyd's Policy") brokered by Marsh.

16.     The Lloyd's Policy included the following reinstatement of limits clause:

> **Reinstatement of Original Limit of Indemnity**
>
> This Section of this Insurance is extended to cover an Event if it is
> Postponed, Relocated or rescheduled. Any reduction in the Limit
> of Indemnity for the Postponed, Relocated or rescheduled Event by
> way of a Loss payment for the original Event can be reinstated up
> to the original Limit of Indemnity at pro rata of the applicable
> premium for the original Event subject to agreement by
> Underwriters.

17.     The reinstatement of limits clause in the Lloyd's Policy permitted Gartner to reinstate the

limit for a particular event only if that event was "Postponed, Relocated or rescheduled,"

but not if the event was cancelled, even though the Lloyd's Policy covered losses due to

cancellation of an event as well as the postponement, rescheduling or relocation of an event.

18.    Subsequent to the issuance of the Lloyd's Policy, Gartner replaced Marsh with Aon as Gartner's broker.  By letter to Aon dated April 1, 2007, Gartner confirmed that appointment, authorizing Aon "to negotiate directly with any interested company as respects changes in existing insurance policies and in closing, changing, increasing or canceling insurance carriers under temporary binders or cover notes."  The only exception to Aon's obligation to Gartner is the statement that Aon "shall not be responsible for any deficiencies in . . . any insurance coverages not placed by Aon Risk Services."

19.    At all relevant times, a special relationship existed between Gartner and Aon.  For years, Gartner has relied on the expertise of Aon in negotiating and procuring adequate event cancellation insurance, and Aon understood that Gartner was relying on Aon's expertise.

20.    Before procuring the Policies at issue, Aon repeatedly touted its expertise in the specialized area of cancellation insurance for the entertainment, events, and conferences industry.  As one presentation to Gartner in August 2007 emphasized, Aon's "Entertainment Practice" has "industry experts fluent in the knowledge of the terms and conditions specific to your unique industry."  Aon described itself in a proposal submitted to Gartner in October 2007 as a "global leader in risk management [and] insurance" and "full-service risk management advisors" who would "form a comprehensive perspective of your organization, matching our products and services to your business strategy."

21.    At the outset of the relationship, Aon met with Gartner in Connecticut to promote its expertise in procuring event cancellation insurance.  Aon also requested specific ·

information from Gartner on the aggregate limits of event cancellation insurance that it required. Gartner emphasized to Aon that a primary concern with respect to event cancellation coverage was that an event, such as a terror attack, early in the policy period which caused the cancellation of many shows could deplete or exhaust the policy limits available to cover Gartner's biggest and most profitable shows which took place late in the year. These included Gartner's largest show, which took place in Florida every fall toward the end of hurricane season. Gartner explained to Aon that it therefore required coverage sufficient to insure most of its events even if it suffered losses due to multiple cancellations earlier in the year. As Aon knew, that was a key requirement for Gartner's event cancellation insurance for each of the event cancellation policies that Aon procured for Gartner.

22. With Gartner's concern in mind, Aon reviewed Gartner's event cancellation coverage issued by Lloyd's and recommended that Gartner make several changes to its event cancellation insurance program to obtain better coverage, including changes in the policy's limits of liability and the reinstatement of limits provisions. Aon then obtained quotations for alternative proposals for an event cancellation policy to replace the expiring Lloyd's Policy.

23. On or around October 5, 2007, pursuant to its appointment as Gartner's broker, Aon Vice President Claudia Kaufman e-mailed Aon's "Gartner Group – Event Cancellation Proposal" to John Riley, Gartner's Managing Vice President, Risk in Stamford, Connecticut. That e-mail contained several attachments, one of which set forth and compared the key features of four alternative proposals for Gartner's event cancellation

coverage that Aon had received from Specialty, which was the underwriter for its affiliate, Houston Casualty Company ("HCC").

24.   Three of the options presented by Aon had annual aggregate limits of $149,000,000. Aon/HCC Renewal Option 1 had an initial aggregate limit of $50,000,000, but, unlike the other three options presented by Aon, contained a provision for "One reinstatement of Full Limits." On October 5, 2007, in a discussion regarding these options, Aon's Chief Executive Officer, George Walden, assured Gartner's John Riley that if Gartner needed additional coverage above the initial aggregate limit, the option with "reinstatement of Full Limits" would provide Gartner with the right to reinstatement of the full $50,000,000 initial limit, thus ensuring that Gartner had access to double the initial annual limit, and that the reinstated limits could be used for any show, or combination of shows, on Gartner's schedule. In an internal Aon email dated October 5, 2007, and sent following the discussion with Mr. Riley, Mr. Walden described this option as "a slam dunk great option."

25.   On October 29, 2007, based on Aon's assurances, Gartner chose the option that Aon presented as providing "One reinstatement of Full Limits," and executed an "Acknowledgement and Approval of Insured," instructing Aon to "bind" that policy in exchange for the 12.5% commission due to Aon out of the premiums paid by Gartner to HCC.

26.   On November 1, 2007, Aon provided Gartner with the "Binder of Insurance" for the policy reflecting a coverage "Limit" of $50,000,000, but also providing that an "Automatic Reinstatement of Limit will apply for additional premium. Reinstatement clause to be agreed."

27.     At the same time it provided the Binder of Insurance to Gartner, Aon forwarded to

        Gartner's John Riley in Connecticut an e-mail exchange between Aon's George Walden

        and Specialty, wherein Walden stated that Specialty had "agreed" that for an additional

        premium, Gartner could "reinstate full limits of $50m in any given policy period."

28.     The "reinstatement clause" in the policy ultimately approved by Aon and issued by HCC

        (the "Reinstatement of Limits Clause") provided as follows:

> **Reinstatement of Original Limit of Liability**
>
> This insurance is extended to cover a Show if it is Cancelled,
> Abandoned, Postponed, Interrupted, Curtailed or Relocated.  The
> Company agrees to reinstate that part of the Limit of Indemnity
> shown in the Schedule utilized by way of any potential or actual
> Loss payment under this Insurance at the sole option of the
> Insured.  If the Insured opts to reinstate the Limit of Indemnity
> then the additional premium payable is calculated at 100% of the
> original premium multiplied by that proportion of the Limit of
> Indemnity reinstated.  Furthermore, if the Limit of Indemnity
> reinstated exceeds the ultimate settled Loss then the Company
> agrees to a return premium for the difference calculated in
> accordance with the foregoing.  The maximum amount that can be
> reinstated shall not exceed $50,000,000.

29.     On February 12, 2008, Aon Vice President Claudia Kaufman provided Gartner with a

        copy of the final policy, and represented to Gartner's John Riley in a letter of that same

        date that the policy was "in accordance [with the] quote proposal/binder previously

        forwarded."

30.     Aon continued to serve as Gartner's insurance broker for its subsequent event

        cancellation policies and continued to receive compensation for negotiating and

        procuring these policies.  Aon negotiated, reviewed, approved, and procured the

        replacement policies and made recommendations to Gartner as to what terms should and

        should not be revised as compared to its expiring policy.  During this biennial process,

        Gartner discussed with Aon its need for adequate aggregate annual limits of liability to

insure its growing events business, and in particular its need to have adequate limits available for its fall and winter events even if Gartner had suffered significant covered losses earlier in the year.

31.     Aon consistently reviewed and approved the language of the replacement policies, which included aggregate limits of liability which, if fully reinstated, would be adequate for Gartner's needs.  For example, on September 18, 2008, Aon specifically recommended to Gartner that the renewal policy for 2009 and 2010 include a $50,000,000 limit "with one reinstatement"; the 2009-2010 policy it subsequently negotiated and placed contained the same Reinstatement of Limits Clause  as was in the first policy negotiated by Aon.  In fact, the Reinstatement of Limits Clause that Aon had reviewed and approved was included in each of the subsequent event cancellation policies underwritten by Specialty and brokered by Aon for Gartner, with the only change being increases to the amount of the annual aggregate limits that could be reinstated to correspond with the increases in the initial annual aggregate limits negotiated and procured by Aon as Gartner's event business grew.  The Destination Policy in effect in 2020 and 2021 had annual aggregate limits of $150,000,000, plus an option to reinstate those limits.

32.     Aon's representations that the Reinstatement of Limits Clause gave Gartner the option to reinstate the full annual aggregate limits of the event cancellation policies and use those reinstated limits for any event, or combination of events, was a key factor for Gartner when selecting coverage to replace the Lloyd's Policy and when selecting each of the subsequent event cancellation policies that Aon recommended, negotiated, approved, and procured as Gartner's broker.

33.     If Aon had told Gartner that the Reinstatement of Limits Clause would not or might not

permit Gartner to reinstate the policies' aggregate limits or that Gartner would not be

permitted to use reinstated limits to cover losses from the cancellation of any of its

insured shows, Gartner would have purchased alternative coverage with initial limits

sufficient to cover its full potential losses from the cancellation of all of its shows.

### *Terms of the Destination Policy*

34.     For the policy in effect from December 30, 2019 through December 31, 2021, Specialty

placed the coverage for the Destination Shows with its affiliated company, USSIC.

Attached as Exhibit A is a true copy of the declarations, Destination Policy form and

initial 2020 schedule for Policy No. U-19/7004347.

35.     Section I of the Destination Policy (Show Cancellation) provides, in relevant part, that

"[t]his insurance indemnifies the Insured against any non-excluded loss occurring

subsequent to the Effective Date resulting in the … **Cancellation, Curtailment,**

**Postponement, Interruption,** Relocation/**Removal to Alternative Premises,** or

**Abandonment** of a **Show**" or "**Enforced Reduced Attendance.**"

36.     The Destination Policy defines "*Curtailment, Cancellation, Postponement, Interruption,*

*Removal to Alternative Premises, Abandonment*" to mean "the inability of the Insured to

open, keep open, or otherwise maintain the **Show** in whole or in part for its original

intent, scope and duration."

37.     The Destination Policy has an initial aggregate annual limit for each year of the two-year

policy—2020 and 2021—of $150,000,000 plus the same Reinstatement of Limits Clause

negotiated and recommended by Aon in late 2007, with the only difference being that the

amount that could be reinstated was increased to match the policy's annual aggregate

limit.  Based on Aon's advice, Gartner understood and believed that the Reinstatement of

11

Limits Clause entitled it to increase the total aggregate limit by up to an additional

$150,000,000 per year, for a potential total aggregate limit of $300,000,000 for each year,

to cover any shows remaining on its schedule after the initial aggregate limits were

exhausted.  Gartner purchased the Destination Policy and selected the limits based on

Aon's advice concerning the Reinstatement of Limits Clause.

### *The Terms of the Evanta Policy*

38.    Evanta Shows are smaller in attendance and duration than Gartner's Destination Shows.

39.    Sometime after acquiring the Evanta events business, Gartner decided to insure the

events put on by Evanta.  Aon first requested, on Gartner's behalf, a quotation from

Specialty for event cancellation coverage for the Evanta Shows in or around April 2019.

40.    In June 2019, Aon presented two options to Gartner: insurance of the full schedule of

Evanta Shows, or a policy with a "loss limit."  Gartner responded that it would proceed

with the proposal for a policy with a "loss limit," but that also included "a reinstatement

feature like the 'original' policy."

41.    Aon ultimately procured a policy on Gartner's behalf containing initial limits of

$20,000,000 insuring the Evanta Shows, modelled closely after the Destination Policy.

Based on Aon's advice regarding the identical Reinstatement of Limits Clause in the

Destination Policy, Gartner understood the Evanta Policy to allow it to reinstate the full

$20,000,000 aggregate limit if Gartner needed to reinstate the initial aggregate limit due

to actual or potential losses.  And, like the Destination Policy, the Evanta Policy

expressly covered losses from cancellations due to a communicable disease.

42.    The Evanta Policy is an eighteen-month policy.  USSIC, through its underwriting affiliate

Specialty, sold Gartner this additional policy, effective June 15, 2019 through December

31, 2020.  Attached as Exhibit B is a true copy of the declarations, Evanta Policy form and initial schedule for Policy No. U-19/7000957.

### *Gartner is Forced to Cancel Events*

43.  In or about late-February 2020, as Covid-19 began to spread beyond China, Gartner was forced to begin postponing and cancelling events to protect the health and safety of its employees, contractors, and attendees — and in response to public advisories and governmental requests to limit travel and gatherings.  After the World Health Organization declared Covid-19 a pandemic, and further restrictions on travel and public gatherings were imposed, Gartner was forced to cancel more of its events.

44.  These cancellations were necessary in the midst of a global public health crisis, and represented a substantial loss to Gartner's profitable and growing events business.  The resulting loss was squarely within the "Communicable Disease" coverage provided by the Destination and Evanta Policies, and Gartner, through Aon, promptly notified Specialty of the cancellations.

45.  On April 15, 2020, given the magnitude of losses suffered by Gartner as a result of the cancellations, Aon asked Specialty to "advise next steps for a full re-instatement of limits" on both Policies.  At or around this time, Aon advised Gartner that, pursuant to the Reinstatement of Limits Clause, Gartner could reinstate up to the full annual aggregate limit of liability to cover losses for any shows scheduled for later in the calendar year that would also have to be cancelled if the pandemic continued.

46.  Thereafter, Aon requested that Specialty provide written confirmation that the limits would be reinstated in accordance with the terms of the Policies.

47.  On May 13, 2020, Specialty sent a letter to Aon, insisting that Gartner's demand for reinstatement was "premature":

> As referenced above, the Policy provides for reinstatement of policy limits based on "potential or actual loss payment." No payment has occurred, nor has Gartner provided preliminary claim information necessary to evaluate the potential amount of each claim. In any event, whether USSIC is required to provide a reinstatement of limits that may potentially respond to a loss in progress which has already occurred or is occurring implicates complex coverage questions that implicate policy language and applicable law. We believe that it is premature at this point to address the question, but USSIC will provide its position on this issue within fourteen (14) days of the date of this letter.

48.   Fourteen days later, on May 27, 2020, Specialty provided its position on reinstatement:

> Gartner has requested that USSIC state its position in writing as to whether USSIC will reinstate limits for the Policy, pursuant to Paragraph 12 of the General Conditions and Warranties, without requiring a COVID-19 exclusion. USSIC will agree to reinstate the original limit of liability for the cancelled Shows, however, as detailed below, the reinstated liability limits for a particular Show will respond solely to costs incurred with respect to the Show or Shows for which reinstatement is requested. In no event can such reinstatement of limits be used for purposes of paying claims related to a separate and unrelated Show, nor will reinstatement of limits result in an increase in the Aggregate Limit of Indemnity.

49.   In other words, Specialty took the position that, contrary to Aon's advice to Gartner, reinstatement was not available to increase the annual aggregate limit of liability, but only to cover losses caused by the cancellation of an event which was then rescheduled to take place during the policy period, and was then cancelled again.

50.   Also on May 27, 2020, USSIC filed two lawsuits against Gartner in the U.S. District Court for the Southern District of Texas, where USSIC has its headquarters. The suits sought declaratory judgments that, among other matters, USSIC is not obligated to reinstate the annual aggregate limits under the Destination Policy or the Evanta Policy. The suits filed by USSIC were dismissed (at great expense to Gartner) for lack of personal jurisdiction.

51.     On June 25, 2020, Gartner filed the USSIC Litigation against USSIC and Specialty.  That lawsuit seeks, among other relief, full reinstatement of the Destination Policy's aggregate limits of $150,000,000 for both 2020 and 2021, for a total of $300,000,000, plus full reinstatement of the Evanta Policy's aggregate limit of $20,000,000.

52.     Reinstatement of the Policies' annual aggregate limits is required to cover Gartner for the losses it suffered because of event cancellations due to Covid-19.  Specialty's adjuster, Hyperion Adjusters, calculated Gartner's losses from the cancelled Destination shows for 2020 alone at $281,919,708.

53.     When USSIC and Specialty refused to honor Gartner's demand to reinstate the Policies' limits, Gartner suffered enormous financial loss.  Gartner has filed claims against USSIC and Specialty to recover that loss.  If the Policies negotiated, approved and procured by Aon, including the Reinstatement of Limits Clause reviewed and approved by Aon, do not provide for reinstatement of the aggregate policy limits and do not permit Gartner to use the reinstated limit for any Show on its schedule as Aon represented to Gartner that they would, then Aon is liable for its failure to negotiate and procure policies with adequate annual limits, or to advise Gartner accurately with respect to the amount of coverage available under the Policies.

## COUNT I
## BREACH OF CONTRACT

1-53.   Gartner re-alleges each and every allegation contained in paragraphs 1 through 53 of the Complaint as if fully set forth herein.

54.     The communications and course of dealing between Aon and Gartner formed a contract whereby Aon and Gartner agreed, in exchange for the payment of a commission paid out of the premiums due to the insurer, that Aon would negotiate and procure on Gartner's

behalf event cancellation insurance policies that were adequate to meet Gartner's needs. Those needs were known to Aon, including without limitation either reinstatement provisions that could double the Policies' initial aggregate limits if necessary to cover Gartner's losses from the cancellation of any of its shows, or a policy with sufficient limits to cover most or all of Gartner's potential losses even absent reinstatement.

55.     Specialty and USSIC disclaimed any obligation to reinstate the Policies' annual aggregate limits, USSIC brought lawsuits in Texas to obtain a declaration that the Policies contained no such right to reinstatement in the manner described to Gartner by Aon, and Specialty and USSIC are defending against Gartner's claim in the USSIC Litigation.

56.     USSIC's and Specialty's refusal to reinstate the Policies' aggregate limits has caused Gartner enormous financial loss.  Gartner has filed claims against USSIC and Specialty to recover that loss.   If the Policies negotiated, approved and procured by Aon do not provide for reinstatement of the aggregate limit and permit Gartner to use the reinstated limit for any Show on its schedule as Aon represented to Gartner that they would, then Aon is liable for its breach of its contractual obligations to Gartner to negotiate and procure event cancellation policies adequate to meet Gartner's needs..

**COUNT II**
**NEGLIGENCE**

1-53.   Gartner realleges each and every allegation contained in paragraphs 1 through 53 of the Complaint as if fully set forth herein.

54.     As Gartner's broker, Aon had a duty to negotiate and procure on Gartner's behalf the coverage requested by Gartner or inform Gartner that it was unable to do so.

55.     Throughout the course of dealing between the parties and in connection with Aon's
        procurement of successive event cancellation policies, Gartner and Aon had specific
        discussions regarding adequate aggregate limits of insurance, inclusive of increased
        limits available under the Reinstatement of Limits Clause, and Aon never suggested that
        the aggregate limits could not be reinstated based on the rationale advanced by USSIC
        and Specialty in the USSIC Litigation.

56.     Gartner repeatedly advised Aon that it required adequate coverage to protect Gartner's
        conference and events business.  Rather than negotiate and procure on Gartner's behalf
        policies with aggregate limits equal to the total anticipated gross revenue from all of
        Gartner's insured shows, as Gartner had done under prior policies, Aon provided an
        option for a policy with smaller aggregate limits, but with what Aon repeatedly assured
        Gartner was the right to reinstate, and thereby double, these aggregate limits if the initial
        limits were exhausted.  Aon also assured Gartner that the reinstated limits could be used
        for any insured show, or combination of shows, on Gartner's schedule.  This was
        particularly important to Gartner because, as it informed Aon, it staged some of its largest
        events in the fall, including its largest event in Florida at the end of hurricane season, and
        wanted to be sure that even if losses from cancelled shows earlier in the calendar year
        depleted the limits, it would still have sufficient limits for the remaining shows during
        that calendar year.

57.     Based on Aon's assurances regarding Gartner's right to reinstatement of the full
        aggregate limits, Gartner ultimately selected, and authorized Aon to purchase, policies
        with lower aggregate limits, plus what Aon repeatedly advised Gartner was the right to

reinstate those full aggregate limits if necessary to cover all of Gartner's losses, including losses for cancellations later in its annual calendar of events.

58. Aon never warned Gartner of any risk that the reinstatement provision negotiated and procured by Aon on Gartner's behalf and approved by Aon could be interpreted in such a way so as not to provide a right to reinstate the Policies' annual aggregate limits to cover any show or combination of Gartner's shows.

59. Specialty and USSIC disclaimed any obligation to reinstate the Policies' aggregate limits, USSIC brought lawsuits in Texas to obtain a declaration that the Policies contained no such right to reinstatement, and Specialty and USSIC are contesting Gartner's claim to reinstatement in the USSIC Litigation.

60. USSIC's and Specialty's refusal to honor Gartner's demand to reinstate the Policies' limit aggregate limits has caused Gartner enormous financial loss.  Gartner has filed claims against USSIC and Specialty to recover that loss.  If the Policies negotiated, approved and procured by Aon, including the Reinstatement of Limits Clause reviewed and approved by Aon, do not provide for reinstatement of the aggregate policy limits and do not permit Gartner to use the reinstated limit for any Show on its schedule, as Aon represented to Gartner that they would, then Aon is liable to Gartner for breach of its duty of care to Gartner, and is liable for Gartner's loss.

## COUNT III
## NEGLIGENT MISREPRESENTATION

1-60. Gartner realleges each and every allegation contained in paragraphs 1 through 60 of Count II of the Complaint as if fully set forth herein.

18

61.   At all relevant times, a special relationship existed between Gartner and Aon.  Gartner relied on Aon's expertise in negotiating and procuring adequate event cancellation coverage, and Aon understood that Gartner was relying on Aon's expertise.

62.   Aon represented to Gartner that the Policies would permit the full reinstatement of aggregate limits to insure Gartner against losses from event cancellations to the extent Gartner required.  For example, on February 12, 2008, Aon represented to Gartner, in writing, that the Policies provided by Specialty were "in accordance [with the] quote proposal/binder previously forwarded."  The November 1, 2007 binder provided for a coverage "Limit" of $50,000,000, as well as "Automatic Reinstatement of Limit . . . for additional premium."

63.   Gartner relied on these representations from Aon when it purchased the event cancellation policy in 2007, and when purchasing each of the subsequent event cancellation policies from Specialty including the Destination and Evanta Policies.

64.   Based on their communications, Aon understood that Gartner would rely on its representations regarding the Reinstatement of Limits Clause in deciding which coverage options to purchase, and that Gartner would be injured if it was unable to access the full amount of coverage that Aon represented was available by virtue of the Reinstatement of Limits Clause.

65.   Specialty and USSIC disclaimed any obligation to reinstate the Policies' aggregate limits, USSIC brought lawsuits in Texas to obtain a declaration that the Policies contained no such right to reinstatement, and Specialty and USSIC are defending against Gartner's claim to reinstatement in the USSIC Litigation.

66.     USSIC's and Specialty's refusal to reinstate the Policies' aggregate limit has caused

Gartner enormous financial loss.  Gartner has filed claims against USSIC and Specialty to

recover that loss.  If the Policies negotiated, approved and procured by Aon do not

provide for reinstatement of the aggregate limits as Aon represented to Gartner that they

would, then Aon negligently misrepresented to Gartner that full reinstatement of

aggregate limits was available under the Policies, and is liable for Gartner's loss.

## COUNT IV
## BREACH OF FIDUCIARY DUTY

1-66.   Gartner realleges each and every allegation contained in paragraphs 1 through 66 of

Count III of the Complaint as if fully set forth herein.

67.     At all relevant times, a special relationship existed between Gartner and Aon.  As

Gartner's broker, who undertook to advise Gartner about its coverage options and to

negotiate, review and approve the policies it procured from Specialty, Aon owed Gartner

a fiduciary duty to negotiate and procure on Gartner's behalf the coverage requested by

Gartner or inform Gartner it was unable to do so.

68.     Gartner relied on Aon's expertise in negotiating and procuring adequate event

cancellation coverage, and Aon understood that Gartner was relying on Aon's expertise

to negotiate, review, and approve these specialized policies.

69.     Aon negotiated and procured on Gartner's behalf event cancellation Policies with

provisions that Aon represented would permit Gartner to reinstate the Policies' aggregate

limits if necessary to cover Gartner's losses.

70.     Specialty and USSIC disclaimed any obligation to reinstate the Policies' aggregate limits,

USSIC brought lawsuits in Texas to obtain a declaration that the Policies contained no

such right to reinstatement, and Specialty and USSIC are defending against Gartner's claim to reinstatement in the USSIC Litigation.

71.     USSIC's and Specialty's refusal to honor Gartner's demand to reinstate the Policies' aggregate limits caused Gartner to suffer enormous financial loss.  Gartner has filed claims against USSIC and Specialty to recover that loss.  If the Policies negotiated, approved and procured by Aon do not provide for reinstatement of the aggregate limit and permit Gartner to use the reinstated limit for any Show on its schedule, as Aon represented to Gartner that they would, then Aon breached its fiduciary duty to Gartner, and is liable for Gartner's loss.

WHEREFORE, Plaintiff Gartner, Inc. demands judgment against Defendant Aon/Albert G. Ruben Insurance Services, Inc. as follows:

a)      money damages;

b)      interest pursuant to common law and/or Conn. Gen. Stat. § 37-3a(a);

c)      attorneys' fees and costs as permitted by law; and

d)      such other and further relief as the Court deems just and proper.


**PLAINTIFF**
**GARTNER, INC.**


By: _____
        Andrew M. Zeitlin
        Tracy Ellis Williams
        SHIPMAN & GOODWIN LLP
        300 Atlantic Street
        Stamford, Connecticut 06901
        Juris No. 412577
        Tel. (203) 324-8100
        Fax (203) 324-8199

        Of Counsel (*pro hac vice* motions forthcoming):

        David S. Mackey
        Tamara S. Wolfson
        ANDERSON & KREIGER LLP
        50 Milk Street, 21st Floor
        Boston, MA 02109
        Tel. (617) 621-6580

        Its Attorneys

RETURN DATE: AUGUST 9, 2022     :     SUPERIOR COURT

GARTNER, INC.,     :     JUDICIAL DISTRICT OF STAMFORD
     Plaintiff,     :     AT STAMFORD

v.

AON/ALBERT G. RUBEN INSURANCE :
SERVICES, INC.,

     Defendant.     :     JULY 12, 2022


## STATEMENT OF AMOUNT IN DEMAND

The amount in demand, exclusive of interest and costs, is greater than $15,000.


**PLAINTIFF**
**GARTNER, INC.**


By: _____
     Andrew M. Zeitlin
     Tracy Ellis Williams
     SHIPMAN & GOODWIN LLP
     300 Atlantic Street
     Stamford, Connecticut 06901
     Juris No. 412577
     Tel. (203) 324-8100
     Fax (203) 324-8199

     Of Counsel (*pro hac vice* motions forthcoming):

     David S. Mackey
     Tamara S. Wolfson
     ANDERSON & KREIGER LLP
     50 Milk Street, 21st Floor
     Boston, MA 02109
     Tel. (617) 621-6580

     Its Attorneys

23

11291448

# EXHIBIT A



# U.S. SPECIALTY INSURANCE COMPANY

13403 Northwest Freeway
Houston, Texas, 77040

YOUR INSURANCE POLICY

From

**Tokio Marine HCC –Specialty Group**

**THIS POLICY CONSISTS OF:**

- **DECLARATIONS**
- **COVERAGE FORM**
- **APPLICABLE ENDORSEMENTS**

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

BY:

**Michael J. Schell**
**PRESIDENT AND CEO**

**Alexander Ludlow**
**SECRETARY**

2-14141

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

2 14141

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7004347
Page 1

## DECLARATIONS PAGE

**1. Name and Address**
**of the Insured:**

Gartner Group, Inc.
291 Broadway, Suite 901
New York, NY 10007

**2. Effective Date:**

a) Shows attaching during the period:
From 12:01 a.m. December 30, 2019
To 12:01 a.m. December 31, 2020

b) Shows attaching during the period:
From 12:01 a.m. January 1, 2021
To 12:01 a.m. December 31, 2021

**3. Limit of Indemnity:**

Up to but not exceeding the Limit of Indemnity for each
Show as stated in Item No. 7 below, subject to the Aggregate
Limit of Indemnity as stated in Item No. 8.

**4. Deductible:**

Nil

**5. Premium:**

a) $1,413,670
b) $1,413,670**

* All notices including renewal, **cancellation**, amendments, modifications, or endorsements to this
policy will be sent to John Riley c/o Gartner Group Inc. 56 Top Gallant Road, Stamford, CT 60902

** It is agreed that the Insured will provide the Schedule of Shows for each policy year as per
Item 7 of the Declarations. Premium rates for 2020 and 2021 policy years are guaranteed. and
can only change if the total value of Shows declared to the policy change. The agreed composite
premium rate is 0.37525% of insured value declared to the policy.

**6. Premium Due Date:** a) $1,130,936 is due 12/30/19 and $282,734 balance of 2020
Premium is due 3/1/20; and

b) $1,130,936 is due 1/1/21 and $282,734 balance of 2020
Premium is due 3/1/21.

**7. Show(s):**

a) As Per the Attached 2020 Schedule. Actual 2020
Schedule of Shows to be reported by Feb. 1, 2020.

b) As Per the Attached 2021 Schedule. Actual 2021 Schedule
of Shows to be reported by Feb. 1, 2021.

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7004347
Page 2

8.  **Aggregate Limit
    of Indemnity:**         a)     $ 150,000,000 in all

                            b)     $ 150,000,000 in all

                            $300,000,000 in all

In consideration of the premium paid; and subject to the definitions, terms, conditions, exclusions and the limit of indemnity as set forth herein this insurance provides coverage as shown.


## Section I Show Cancellation

### INSURING AGREEMENT AND LIMITS OF LIABILITY

This insurance indemnifies the Insured against any non-excluded loss occurring subsequent to the **Effective Date** resulting in the:

1.  **Cancellation, Curtailment, Postponement, Interruption**, Relocation/**Removal to Alternative Premises, or Abandonment of a Show**; or
2.  Non-Appearance of a principal speaker or entertainer when such Non-Appearance is solely and directly caused by accident, sickness, death or unavoidable travel delay.
3.  Failure by the Insured to vacate the **Show's** facility at the termination of tenancy; or
4.  **Enforced Reduced Attendance,**

## Calculation of Loss – Gross Revenue

Loss shall be determined as follows:

1.  In respect of losses covered under Section I **Show Cancellation** 1. 2. or 4. the greater of:

    (i)     the loss of **Gross Revenue** that would have been received in the absence of the covered loss, whether or not the insured is obligated by contract or otherwise to return such **Gross Revenue**, plus the insured's loss from **Commitments**, less recoveries made and any necessary **Expenses** not incurred. Pro-rata return of any part of **Gross Revenue** in connection with a **Show** shall be considered as loss of **Gross Revenue**; or

    (ii)    the total of **Expenses** incurred plus loss of **Commitments**, less any recoveries obtained, and less **Gross Revenue** retained after refunds, whether or not the insured is obligated by contract or otherwise to return such **Gross Revenue**, and

    (iii)   with respect to (i) and (ii) above the reasonable cost incurred, agreed, or committed by the Insured to avoid, diminish, or mitigate the extent, scope or

possibility of a loss including costs to reschedule and or remarket a **Show**. Such costs include but are not limited to: extra expense, transportation, accommodation, **Commitments**, incentives, advertising, promotion, marketing and public relations **Expenses**. The cost of such action is in addition to the limit of liability.

2.   In respect of loss covered under Section I  **Show Cancellation** 3. :
any claim for damages, costs or compensation in accordance with any contract between the insured and the owners or management of a **Show** facility by reason of the Insured's failure or inability to vacate the facility or show venue at the termination of the Insured's tenancy. Such claim shall also include any other agreed, committed or additional expense over and above the Insureds budgeted expense resulting from or by reason of a failure to vacate.

**3.**   EXTENSIONS OF COVERAGE

(i)   NEWLY ORGANIZED **SHOW** – Subject to a limit of Indemnity of $2,000,000 insurers agree to provide automatic coverage for up to 90 days for any newly organized or acquired **Show**(s). The Insured will provide Insurers with the specifics of the new **Show** and coverage shall be scheduled and a premium charge made at the agreed composite premium rate evidenced on the Declarations page.

(ii)   In addition to **Shows** listed in the schedule of events or as declared in accordance with (i) above, this policy is extended automatically and at no additional premium-, to cover any additional events scheduled to take place during the policy period subject to **Gross Revenue** or **Expenses** not exceeding $250,000.

(iii)   **EMERGENCY TRANSPORTATION OF ATTENDEES** – This insurance indemnifies the Insured up to USD $250,000 for additional **Expenses** incurred if pre-booked transportation is unavailable from an offsite location to the **Show** venue.

(iv)   ADDITIONAL MARKETING **EXPENSES** - This insurance will indemnify the insured for marketing **Expenses** including public relations and advertising costs of a rescheduled **Show** or if not rescheduled the corresponding or a similar **Show** that is held the following year. Such costs are in addition to the limit of liability.

(v)   **TERRORISM** – To indemnify the insured for any loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any act or threat of **terrorism** (whether actual or perceived) regardless of any other cause contributing concurrently or in any sequence to the loss.

It is further agreed and understood that should an act of **terrorism** occur, as defined above, within 14 days of a **show** and within 25 miles of the venue of a **show**, the Insured, solely at its own discretion, shall have the right to cancel, postpone or abandon the insured event.

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7004347
Page 4

(vi)   COMMUNICABLE DISEASE – This insurance is to indemnify the insured for any loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any outbreak of communicable disease (whether actual or perceived) regardless of any other cause contributing concurrent y or in any sequence to the loss.

## Section I Exclusions

1.   This insurance does not cover loss arising as a direct result of any one or more of the following:

   a)   withdrawal, insufficiency or lack of finance howsoever caused;
   b)   the financial failure of any venture;
   c)   lack of or inadequate receipts, sales or profits of any venture;
   d)   variations in the rate of exchange, rate of interest or stability of any currency;
   e)   financial default, insolvency, or failure to pay of any person, corporation or entity;
   f)   Lack of or inadequate response, support or withdrawal of support by any party whose support is essential to the production of the **Show**;
   g)   Lack of or inadequate attendance or insufficient interest prior to the **Show**;

   unless caused by or a result of an event not otherwise excluded by this Insurance.

   All (1.a) to (1.g) whether a party to this insurance or otherwise.

2.   This insurance does not cover loss arising directly as a result of:

   a)   The insureds failure to make the necessary arrangements that the insured deems reasonable and necessary to ensure that the Show can be held as scheduled.

   b)   Circumstances existing prior to the inception of this insurance known by the Insured that could result in a loss unless the Insured had advised the **Company** of such circumstance and the **Company** accepted the risk by endorsement attached hereto and that any additional premium required has been paid by the Insured. For the purposes of this exclusion, insured means the Risk Manager, CEO, CFO or General Counsel of the Named Insured.

   c)   Non-appearance of an entertainer when their performance or engagement is the sole and principal purpose of the **Show**.

## Section II: Physical Loss to Personal Property

### Limit of Indemnity

Up to, but not exceeding $250,000 in all for each **Show**.

### Property Covered
All personal property owned, leased or rented by the Insured while in transit directly to or from the **Show** or while in use in connection with the **Show**.

### Risks Covered
All risks of direct physical loss or damage to property covered occurring during the period of the insurance and subject to the exclusions, conditions and applicable Limit of Indemnity stated in Section II above.

### Property Excluded

The following property is not covered:

1.   Property sold, leased, rented or loaned by the Insured to others;

2.   Vehicles licensed for use on the highway unless operated within the confines of the **Show** facility and the subject of or intended for display, exhibition or demonstration at a **Show**;

3.   Money (which, for this Part II only means cash, bank notes, checks and other negotiable instruments, securities for money and stamps), jewellery, precious stones, and furs, unless such items are the subject intended for display, exhibition or demonstration at a **Show**.

### Section II Exclusions

This policy does not cover loss or damage caused by or arising from:

1.   wear and tear or gradual deterioration;

2.   Inventory shortage or mysterious disappearance;

3.   Loss of use, business **interruption**, extra expense or any other consequential loss.

2-14141
EVENT CANCELLATION INSURANCE                          FORM NO. Gartner Special (ED. 12/30/19)

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7004347
Page 6

## Section III: Door Registration Receipts

### Limit of Indemnity

Up to, but not exceeding $100,000 in all for each **Show**.

### Property Covered

"Money" meaning, for this Part III only, receipts paid in cash, bank notes, checks and other negotiable instruments at the **Show** facility for registration, or tickets for events directly associated with the **Show**.

### Risks Covered

All risks of direct physical loss of money at the **Show** facility and while directly in route to a bank in the vicinity occurring during the period of this insurance and subject to the exclusions, conditions and applicable Limit of Indemnity stated in Section III above.

### Section III Exclusions

This insurance does not cover:

1) Any loss when the registration desk or place where money is received is closed for business or temporarily unattended unless the money is in a locked safe and all safe keys have been removed and are in the custody of the Insured;
2) All claims not advised to the **Company** within thirty (30) working days of the date of loss;
3) Theft or dishonesty by any employee or any other person acting on behalf of the Insured;
4) Any loss when outside the **Show** facilities unless the money is accompanied by two able bodied persons.

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7004347
Page 7

## GENERAL EXCLUSIONS APPLICABLE TO ALL SECTIONS

1.　　*War*

Any losses arising from an act of declared or undeclared War. Declared or undeclared War does not include acts of terrorism. "War" as used herein means:

a) hostilities following a declaration of War by a government authority, or

b) if there is no declaration of War, then armed, open and continuous hostilities between two countries.

2.　　*Radioactive Contamination*

Loss or damage arising directly or indirectly from nuclear reaction, nuclear radiation, or radioactive contamination regardless of any other cause or event that directly or indirectly
contributes concurrently to or contributes in any sequence to the loss or damage even if such other cause or event would otherwise be covered.  Nevertheless, if a fire arises directly from nuclear reaction, nuclear radiation, or radioactive contamination any loss or damage arising from that fire shall (subject to the provisions of this insurance) be covered, excluding, however, all loss or damage caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

3.　　*Nuclear, Biological or Chemical Materials*

Loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with the actual or threatened malicious use of a nuclear weapon or device or of the actual or threatened malicious use of pathogenic or poisonous biological or chemical materials.

## GENERAL CONDITIONS AND WARRANTIES

1.  *False or Fraudulent Acts*

    Any fraud, misstatement or concealment in the application attached hereto, or in the making of a claim shall render this insurance void and all claims hereunder shall be forfeited.

2.  *Conditions for Legal Action Clause*

    No suit shall be brought upon this policy unless the Insured has complied with all the provisions of this policy and had commenced suit within one year after the loss occurs.

3.  *Subrogation Clause*

    The **Company** reserves the right to pursue an action for recovery after payment of a loss at their sole discretion and in the name of the Insured or otherwise unless the Insured has waived their right of subrogation as evidenced by a written contract executed prior to such loss. In the event of any payment under this Insurance, the **Company** shall be subrogated to the extent of such payment to all rights of recovery, and the Insured shall execute all papers required and shall do everything that may be reasonable to secure such rights.

4.  *Other Insurance Clause*

    This insurance is primary and non-contributory

5.  *Non-Assignment Clause*

    This insurance may not be assigned in whole or in part without the written consent of the **Company**, such consent not to be unreasonable withheld.

6.  *Premium not an Expense Clause*

    The premium paid on this policy is deemed not to be an expense in assessment of any claim hereunder.

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7004347
Page 9

7.   *Arbitration Clause*

If there are differences arising out of this Insurance and it is agreed by the Insured and the **Company** to arbitrate the differences, all differences arising out of this Insurance shall be referred to the decision of an Arbitrator to be appointed in writing by the parties in difference or if they cannot agree upon a single Arbitrator to the decision of two

Arbitrators, one to be appointed in writing by each of the parties within 30 days after having been required in writing to do so by either of the parties. The two Arbitrators shall appoint an Umpire who shall sit with the Arbitrators and preside at their meetings. If the Arbitrators do not agree within 60 days of their appointment then the Umpire shall

make the award within 60 days.  ·

If the parties agree on an Arbitrator the cost will be split equally between the parties. If the parties cannot agree on a single Arbitrator then each party will be responsible for the cost of the Arbitrator they have selected and will split equally the cost of the Umpire.

8.   *Limit of Indemnity*

The **Company**'s Limit of Indemnity for loss or damage under this insurance is the applicable limit set forth in the Declarations or as otherwise stated in this policy of insurance.

9.   *Increase in Limits of Indemnity*

It is understood and agreed that the Aggregate Limit of Indemnity is a loss limit and may not be sufficient to cover the aggregate value of all **Shows**. At any time prior to commencement of a **Show** or **Shows** the Insured can apply in writing for increased indemnity limits based upon revised financial estimates of **Gross Revenues**, **Expenses** or **Commitments**, provided that there is no circumstance(s) known by the insured which may give rise to a claim with respect to such **Show** or **Shows** declared to this insurance. Insured as used herein means the Risk Manager, CEO, CFO or General Counsel of the Named Insured. It is understood and agreed that if **Gross Revenue**, **Expenses** or **Commitments** for any one, several or all **Shows** as per Item 7 of the Declarations increases in value by a factor of 10% or less, there will be no change in premium and the Limit of Indemnity for any one, several or all **Shows** as per item 7 of the Declarations automatically increase accordingly.

10.   *Non-Cancellation Clause*

This insurance cannot be cancelled by the **Company** except for non-payment of premium.

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7004347
Page 10

11.     *Conformity to Statute Clause-Conflict With State Amendatory Endorsement*

In the event there is any conflict between any state amendatory endorsement and other provisions contained in this Policy, the terms and provisions providing coverage which is most favorable to the **Insured** shall apply, to the extent permitted by law.

12.     *Reinstatement of Original Limit of Liability*

This Insurance is extended to cover a **Show** if it is Cancelled, Abandoned, Postponed, Interrupted, Curtailed or Relocated. The **Company** agrees to reinstate that part of the Limit of Indemnity shown in the Schedule utilized by way of any potential or actual Loss payment under this Insurance at the sole option of the Insured. If the Insured opts to reinstate the Limit of Indemnity then the additional premium payable is calculated at 100% of the original premium multiplied by that proportion of the Limit of Indemnity reinstated. Furthermore, if the Limit of Indemnity reinstated exceeds the ultimate settled Loss then the **Company** agrees to a return premium for the difference calculated in accordance with the foregoing. The maximum amount that can be reinstated shall not exceed $150,000,000.

13.     It is understood and agreed that this Insurance will extend to cover a Recurring **Show** scheduled to take place up to 90 days immediately following the expiration of the policy providing always that the loss occurs within the Policy Period and the event was previously insured under the policy.

## CLAIMS PROCEDURE

In the event of any happening or circumstance which gives rise to a claim under this Insurance the Insured shall:

1.      i) as a matter of urgency give notice of the happening or circumstance to:

HCC Specialty Underwriters, Inc.
401 Edgewater Place, Suite 400
Wakefield, MA 01880
Phone: (781) 994-6000
Fax:    (781) 994-6001

ii) confirm the facts of the claim in writing as soon as possible, with as much information as available;

iii) provide the **Company** or their appointed representatives with:

a)      all necessary and reasonable assistance,

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7004347
Page 11

    b)    documentation and records necessary to establish and assess indemnity hereunder,

    c)    copies or extracts as may be requested in support of a claim.

iv.) forward immediately to the **Company** or their representatives any letter, writ or other document received in connection with any claim made under this Insurance.

2.    The Insured as often as may be reasonably required shall submit to examination under oath on all matters connected with a claim, by any person named by the **Company** at such reasonable time and place as may be designated by the **Company** or their representatives.

So far as is in their power the Insured shall cause their employees to comply with the foregoing.

No such examination under oath or examination of books or documents, nor any other act of the **Company** or their representatives in connection with any investigation hereunder shall be deemed a waiver of any defense which the **Company** might otherwise have. All such examinations and acts shall be deemed to have been made or done without prejudice to the **Company's** liability.

3.    As soon as is practicable and at the request of the **Company**, the Insured will render a signed and sworn Proof of Loss to the **Company** or their representative to substantiate the occurrence, nature, cause and amount of loss claimed under this Insurance

4.    The **Company** reserves the right, if they so wish, to take over and conduct the defense or settlement of claims made against the Insured that are covered by this Insurance.

## DEFINITIONS

*Curtailment,*
*Cancellation,*
*Interruption,*
*Postponement,*
*Removal to Alternative Premises,*
*Abandonment*

all mean the inability of the Insured to open, keep open, or otherwise maintain the **Show** in whole or in part for its original intent, scope and duration.

*"Gross Revenue"* means the total of all revenue to the Insured from any and all source(s) with respect to a **Show** including without limitation: ticket sales, exhibitor's fees; advance reservations; admissions; advertising and sponsorship.

*"Expenses"* means the total of all costs and charges incurred, committed or agreed by the Insured in organizing, running, maintaining, providing services and or otherwise to present or hold the **Show**.

*"Show"* means conference, meeting, board meeting, show, exhibition, convention, exposition, trade show or any other Show which is insured under this insurance and includes installation and the dismantling of the Show during the period shown on the Declarations Page up to and including the date that the Insured vacates the venue.

*"Enforced Reduced*
*Attendance"* means some of the expected exhibitors, delegates, attendees or visitors being prevented from arriving at a **Show** solely and directly as a result of the same specific proximate cause, which is beyond their control and, is not otherwise excluded.

*Insurance*
*"Effective Date"* means the date shown in the declarations or the effective date of cover for any **Show** added by endorsement.

*"Deductible"* means the amount shown on the Declarations page and which shall be deducted from the final gross adjusted loss payable to the Insured.

*"Company"* means US Specialty Insurance Company.

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7004347
Page 13

*"Commitment(s)"*  mean the Insured's financial commitments unless they are released or discharged from such financial commitments, which are necessary for the operation or commencement of the Show and are intended to be discharged by a third party and which are made prior to
any incident which could give rise to a covered loss with respect to the Show.

*"Terrorism"*  means any act including without limitation, the use of force or violence or the threat of such an act (whether actual or perceived) of or by any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and or to put the public or any section of the public in fear.

*"Emergency Transportation
of Attendees"*  means the unplanned evacuation of attendees who need to be transported back to the Show venue from an off-site location due to an unexpected cause beyond the control of the Insured and not otherwise excluded.

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7004347
Page 14

**ENDORSEMENT NUMBER**          1

**Attaching to and forming part of U.S. Specialty Insurance Company Policy No.  U-19/7004347**

Assured:        Gartner Group, Inc.

**It is hereby noted and agreed that:**

**The following Exclusion is added to GENERAL EXCLUSIONS APPLICABLE TO ALL SECTIONS:**

A loss resulting from the Catalonian independence movement arising out of civil commotion, insurrection or rebellion for **shows** being held in Spain.

**All other terms and conditions remain unchanged.**

**Additional Premium:**          N/A
**Return Premium:**             N/A
**Effective Date:**               December 30, 2019
**Date of Issue:**                February 25, 2020

**U.S. SPECIALTY INSURANCE COMPANY**

By        _____

**Authorized Representative**

2-14141
EVENT CANCELLATION INSURANCE                          FORM NO. Gartner Special (ED. 12/30/19)

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7004347
Page 15

**ENDORSEMENT NUMBER**                    **2**

**Attaching to and forming part of U.S. Specialty Insurance Company Policy No. U-19/7004347**

Assured:        Gartner Group, Inc.

**It is hereby noted and agreed that:**

**The following Exclusion is added to GENERAL EXCLUSIONS APPLICABLE TO ALL SECTIONS:**

National, court or religious mourning with respect to any individual(s) aged 70 years or higher at the inception of this Policy for **shows** being held in the United Kingdom and/or the UAE.

**All other terms and conditions remain unchanged.**

**Additional Premium:**        N/A
**Return Premium:**        N/A
**Effective Date:**        December 30, 2019
**Date of Issue:**        February 25, 2020

**U.S. SPECIALTY INSURANCE COMPANY**

By

**Authorized Representative**

2-14141
EVENT CANCELLATION INSURANCE                    FORM NO. Gartner Special (ED. 12/30/19)

ENDORSEMENT NUMBER            3

Attaching to and forming part of U.S. Specialty Insurance Company Policy No.  U-19/7004347

        Assured:      Gartner Group, Inc.

               It is hereby noted and agreed that:

### SANCTION LIMITATION AND EXCLUSION CLAUSE

No insurer shall be deemed to provide cover and no insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

15/09/10

LMA3100

               All other terms and conditions remain unchanged.

**Effective Date:**           December 30, 2019
**Date of Issue:**           February 25, 2020

                   U.S. SPECIALTY INSURANCE COMPANY

By          _____
                     Authorized Representative

2-14141

ENDORSEMENT NUMBER          4

Attaching to and forming part of U.S. Specialty Insurance Company Policy No. U-19/7004347

    Assured:          Gartner Group, Inc.

              It is hereby noted and agreed that:


            U.S. Terrorism Risk Insurance Act, as amended in 2015
                   New & Renewal Business Endorsement


*This Endorsement is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act, as amended in 2015", as summarized in the disclosure notice.*

In consideration of an additional premium of USD $382,606.40 for certified acts of terrorism and $95,651.60 for non certified acts of terrorism paid, it is hereby noted and agreed with effect from inception that the Terrorism exclusion to which this Insurance is subject, shall not apply to any "Insured loss" directly resulting from any "act of terrorism" as defined in the U.S. Terrorism Risk Insurance Act of 2015, as amended (TRIA).

The coverage afforded by this Endorsement is only in respect of any "insured loss" of the type insured by this Insurance directly resulting from an "act of terrorism" as defined in TRIA. The coverage provided by this Endorsement shall expire at 12:00 midnight December 31, 2020, the date on which the TRIA Program is scheduled to terminate, or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates. The Terrorism exclusion, to which this Insurance is subject, applies in full force and effect to any other losses and any act or events that are not included in said definition of "act of terrorism".

This Endorsement only affects the Terrorism exclusion to which this Insurance is subject. All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

Furthermore the Underwriter(s) will not be liable for any amounts for which they are not responsible under the terms of TRIA (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on the Underwriter's liability for payment for terrorism losses.


              All other terms and conditions remain unchanged.

**Effective Date:**              December 30, 2019
**Date of Issue:**               February 25, 2020


                    U.S. SPECIALTY INSURANCE COMPANY


            By      _____

                       **Authorized Representative**



2 14141

TRIA SPECIALTY ENDORSEMENT 2 (1/1/15)

Gartner 2020 Schedule of Events
Based on 2019 Schedule - to be adjusted on 2/1 when updated schedule received

| Event Name | | Limit of Insurance | Event Dates | Venue | Country | City |
|---|---|---|---|---|---|---|
| 1753 | SCM Live Americas | $ 1,419,691.45 | Feb-20 | JW Marriott Turnberry Miami | USA | Aventura, FL |
| 1672 | Data & Analytics Summit APAC | $ 2,662,953.33 | Feb-20 | International Convention Centre | Australia | Sydney |
| 0088 | Data & Analytics Summit EMEA | $ 7,815,041.24 | Mar-20 | InterContinental Hotel - The O2 | UK | London |
| 1588 | Middle East Symposium - ITxpo | $ 5,166,545.11 | Mar-20 | Madinat Jumeirah | UAE | Dubai |
| 1678 | Identity & Access Mgmt Summit EMEA | $ 3,291,483.30 | Mar-20 | InterContinental Hotel - The O2 | UK | London |
| 0087 | Data & Analytics Summit NA | $ 19,933,003.93 | Mar-20 | Orlando World Center Marriott | USA | Orlando |
| 1498 | IT Infrastructure and Data Center Jpn | $ 1,628,468.69 | Apr-20 | Hachijyoen (Happo En) | Japan | Tokyo |
| 1769 | I&O & Data Center Summit Brazil | $ 1,563,973.84 | Apr-20 | Sheraton WTC Hotel | Brazil | São Paulo |
| 0980 | I&O and Data Center Summit APAC | $ 1,924,795.15 | Apr-20 | Hilton Sydney Hotel | Australia | Sydney |
| 2850 | Digital Marketing US Symposium | $ 6,012,855.34 | May-20 | Marriott Marquis Marina | USA | San Diego |
| 1770 | I&O & Data Center Summit India | $ 928,565.62 | May-20 | Renaissance Convention Centre Hotel | India | Mumbai |
| 1784 | Supply Chain Exec Conf NA | $ 13,638,225.47 | May-20 | JW Marriott Desert Ridge Resort | USA | Phoenix |
| 1610 | EA & Tech Innov Summit NA | $ 4,512,648.67 | May-20 | Hilton Orlando | USA | Orlando |
| 0051 | Apps Summit EMEA | $ 3,095,731.28 | May-20 | Park Plaza Westminster | UK | London |
| 1862 | CIO and IT Executive Summit DACH | $ 1,578,450.06 | May-20 | Westin Grand | Germany | Munich |
| 0048 | Customer Strat & Tech Summit EMEA | $ 2,911,487.41 | May-20 | Park Plaza Westminster | UK | London |
| 1864 | Data & Analytics Summit Brazil | $ 2,290,438.15 | May-20 | Sheraton WTC Hotel | Brazil | São Paulo |
| 2852 | Digital Workplace Summit NA | $ 1,678,586.69 | May-20 | Gaylord Palms Resort & Convention Center | USA | Kissimmee, FL |
| 1605 | EA & Tech Innov Summit EMEA | $ 2,579,775.53 | Jun-20 | Park Plaza Westminster | UK | London |
| 1992 | Tech Growth & Innovation Conf NA | $ 1,810,061.69 | Jun-20 | Manchester Grand Hyatt | USA | San Diego |
| 2837 | Canada Symposium - Itxpo | $ 2,954,310.32 | Jun-20 | Beanfield Centre at Exhibition Place | Canada | Toronto |
| 1853 | IT Infrastructure & Ops Mgmt DACH | $ 2,555,898.60 | Jun-20 | Kap Europa | Germany | Frankfurt |
| 0882 | PPM & IT Governance Summit EMEA | $ 1,962,918.26 | Jun-20 | Park Plaza Westminster | UK | London |
| 0898 | Data & Analytics Jpn | $ 1,111,243.16 | Jun-20 | Tokyo Conference Center - Shinagawa | Japan | Tokyo |
| 1772 | Data & Analytics Summit India | $ 1,302,676.94 | Jun-20 | Renaissance Convention Centre Hotel | India | Mumbai |
| 0071 | Security & Risk Mgmt Summit NA | $ 27,581,786.68 | Jun-20 | Gaylord National Resort & Convention Center | USA | National Harbor, MD |
| 1590 | Customer Experience & Tech APAC | $ 1,097,215.50 | Jun-20 | Hilton Sydney Hotel | Australia | Sydney |
| 1771 | PPM & IT Governance Summit NA | $ 5,134,961.44 | Jun-20 | Marriott Marquis | USA | Washington |
| 2888 | Supply Chain Ex Conf EMEA | $ 5,539,319.44 | Jun-20 | Palau de Congressos de Catalunya | Spain | Barcelona |
| 2416 | CISO Exec Summit - New York | $ 1,175,000.00 | Jun-20 | Pier Sixty at Chelsea Piers | USA | New York |
| 1485 | SCM Leaders Forum | $ 2,030,732.49 | Jul-20 | The Grove Hotel | UK | Chandlers Cross, Hertfordshire |
| 0014 | Apps Summit APAC | $ 1,627,364.52 | Jul-20 | Hilton Sydney Hotel | Australia | Sydney |
| 0901 | Security and Risk Management Jpn | $ 1,674,449.09 | Aug-20 | ANA Intercontinental Hotel Tokyo | Japan | Tokyo |
| 1817 | Catalyst Conference NA | $ 8,376,592.20 | Aug-20 | Manchester Grand Hyatt | USA | San Diego |
| 1389 | Security & Risk Mgmt Summit Brazil | $ 1,914,875.83 | Aug-20 | open | Brazil | São Paulo |
| 1499 | Security & Risk Mgmt Summit APAC | $ 3,164,861.52 | Aug-20 | Hilton Sydney Hotel | Australia | Sydney |
| 0064 | Security & Risk Mgmt Summit India | $ 1,438,599.20 | Aug-20 | open | India | Mumbai |
| 0872 | IT Sourcing & Vendor Mgmt NA | $ 6,519,689.57 | Sep-20 | Gaylord Texan Hotel & Convention Center | USA | Dallas |
| 0050 | Security & Risk Mgmt Summit EMEA | $ 6,497,019.78 | Sep-20 | InterContinental Hotel - The O2 | UK | London |
| 2587 | Global CISO | $ 1,850,000.00 | Sep-20 | Four Seasons Westlake Village | USA | Westlake Village, CA |
| 2586 | Global CIO | $ 1,000,000.00 | Sep-20 | Four Seasons Westlake Village | USA | Westlake Village, CA |
| 1606 | Digital Workplace Summit EMEA | $ 3,986,327.10 | Sep-20 | InterContinental Hotel - The O2 | UK | London |
| 0899 | IT Sourcing & Vendor Mgmt EMEA | $ 3,572,395.20 | Sep-20 | InterContinental Hotel - The O2 | UK | London |
| 1329 | South Africa Symposium - ITxpo | $ 2,899,422.31 | Sep-20 | open | South Africa | Cape Town |
| 1873 | Catalyst Conference EMEA | $ 2,867,703.24 | Sep-20 | Park Plaza Westminster | UK | London |
| 2624 | SMAC NA | $ 4,147,825.99 | Sep-20 | The Cosmopolitan | USA | Las Vegas |
| 2622 | Reimagine HR - EMEA | $ 1,587,345.09 | Sep-20 | Park Plaza Westminster | UK | London |
| 0096 | US Symposium - ITxpo | $ 65,824,327.19 | Oct-20 | Walt Disney World Swan & Dolphin Resort | USA | Lake Buena Vista, FL |
| 0013 | ANZ Symposium - ITxpo | $ 10,713,304.72 | Oct-20 | open | Australia | Gold Coast |
| 0912 | Brazil Symposium - ITxpo | $ 3,541,703.08 | Oct-20 | open | Brazil | São Paulo |
| 2621 | Reimagine HR - NA | $ 3,917,760.38 | Oct-20 | open | USA | Orlando |
| 1878 | Security & Risk Mgmt Summit ME | $ 1,935,941.59 | Oct 20 | open | UAE | Dubai |
| 0045 | Europe Symposium - ITxpo | $ 40,577,858.86 | Nov-20 | open | Spain | Barcelona |
| 1549 | India Symposium - ITxpo | $ 4,001,413.78 | Nov-20 | open | India | Goa |
| 0897 | Symposium Japan | $ 4,159,384.66 | Nov-20 | open | Japan | Tokyo |
| 1877 | Data & Analytics Summit DACH | $ 4,525,923.58 | Nov-20 | Kap Europa | Germany | Frankfurt |
| 1496 | I&O and Data Center Summit EMEA | $ 4,879,334.71 | Nov-20 | open | UK | London |
| 2853 | Supply Chain Planning Summit NA | $ 1,511,979.68 | Nov-20 | open | USA | open |
| 2008 | Apps Summit NA | $ 9,350,894.91 | Dec-20 | open | USA | Las Vegas |
| 2838 | I&O & Cloud Strategies Summit NA | $ 19,559,405.73 | Dec-20 | open | USA | Las Vegas |
| 1584 | Identity & Access Mgmt Summit NA | $ 12,170,605.38 | Dec-20 | open | USA | Las Vegas |

# EXHIBIT B



**TOKIOMARINE**
**HCC**

# U . S .   S P E C I A L T Y   I N S U R A N C E   C O M P A N Y

13403 Northwest Freeway
Houston, Texas, 77040

YOUR INSURANCE POLICY

From

## Tokio Marine HCC –Specialty Group

**THIS POLICY CONSISTS OF:**

- · **DECLARATIONS**
- · **COVERAGE FORM**
- · **APPLICABLE ENDORSEMENTS**

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

BY: _____

**Michael J. Schell**
**PRESIDENT AND CEO**

_____

**Alexander Ludlow**
**SECRETARY**

2-14141

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS.  HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

2-14141

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7000957
Page 1

## DECLARATIONS PAGE

1. **Name and Address
   of the Insured:**

   Gartner Group, Inc.
   291 Broadway, Suite 901
   New York, NY 10007

2. **Effective Date:**    From        12:01 a.m. June 15, 2019
                          To          12:01 a.m. December 31, 2020

3. **Limit of Indemnity:**    Up to but not exceeding the Limit of Indemnity for each
                             Show as stated in Item No. 7 below, subject to the Aggregate
                             Limit of Indemnity as stated in Item No. 8.

4. **Deductible:**    Nil

5. **Premium:**    $141,082

- All notices including renewal, **cancellation**, amendments, modifications, or endorsements to
  this policy will be sent to **John Riley c/o Gartner Group Inc. 56 Top Gallant Road,
  Stamford, CT 60902**

6. **Premium Due Date:**    $141,082 due 6/15/19.

7. **Show(s):**    As per the attached Schedule of Events

8. **Aggregate Limit
   of Indemnity:**    $20,000,000 in all

EVENT CANCELLATION INSURANCE                          FORM NO. 1 (ED 5/8/07)

2-14141

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7000957
Page 2

In consideration of the premium paid, in reliance upon the statements in the application attached and made a part of this policy, and subject to the definitions, terms, conditions, and exclusions set forth herein and limits of indemnity, this insurance provides coverage as shown.

## Section I Show Cancellation

### INSURING AGREEMENT AND LIMITS OF LIABILITY

Unless limited or endorsed herein, this insurance indemnifies the Insured against any loss occurring subsequent to the **Effective Date** and causing the unavoidable:

1. **Cancellation, Curtailment, Postponement, Interruption**, Relocation/Removal to **Alternative Premises**, or **Abandonment** of a **Show**; or
2. Non-Appearance of a principal speaker or entertainer when such Non-Appearance is solely and directly caused by accident, sickness, death or unavoidable travel delay.
3. Failure by the Insured to vacate the **Show's** facility at the termination of tenancy; or
4. **Enforced Reduced Attendance**;

arising from a non-excluded cause beyond the control of the Insured.

The Limit of Indemnity for loss provided by this policy is the applicable limit set forth in the declarations and/or any endorsement(s) attached hereto.

## Calculation of Loss – Gross Revenue

Subject to the limit of indemnity and applicable conditions of this insurance, loss shall be determined:

1. In respect of losses covered under Section I (1), (2) and (4), the greater of:

   (i)   the loss of **Gross Revenue** that would have been received in the absence of the covered loss, whether or not the insured is obligated by contract or otherwise to return such **Gross Revenue**, plus the insured's loss from **Commitments**, less recoveries and any **Expenses** not incurred. Pro-rata return of any part of **Gross Revenue** in connection with a **Show** shall be considered as loss of **Gross Revenue**; or

   (ii)  the total of **Expenses** incurred plus loss of **Commitments**, less any recoveries, and less **Gross Revenue** retained after refunds;

and with respect to (i) and (ii) above the reasonable cost incurred, agreed, or committed by the Insured as the Insured deems appropriate to avoid, diminish, or mitigate the extent, scope or possibility of a loss including costs to reschedule and or remarket a **Show**. Such costs include but are not limited to: extra expense, transportation, accommodation, **Commitments**, incentives, advertising, promotion, marketing and public relations **Expenses**. The cost of such action is in addition to the limit of liability.

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7000957
Page 3

**2.**   In respect of loss covered under Section I (3);

    (i)   any claim for damages, costs or compensation in accordance with any contract between the insured and the owners or management of a **Show** facility by reason of the Insured's failure or inability to vacate the facility at the termination of the Insured's tenancy; and

    (ii)   the insured's direct and necessary additional **Expenses** incurred, agreed or committed by reason of the failure to vacate

**3.**   **EXTENSIONS OF COVERAGE**

    (i)   **NEWLY ORGANIZED SHOW** – Subject to a limit of indemnity of $1,000,000 insurers agree to provide automatic coverage for up to 90 days for any newly organized or acquired **Show**(s). The Insured will provide insurers with the specifics of the new **Show** and coverage shall be scheduled and a premium charge made at the agreed composite premium rate evidenced on the Declarations page.

    (ii)   **EMERGENCY TRANSPORTATION OF ATTENDEES** – This insurance indemnifies the Insured up to USD $250,000 for additional **Expenses** incurred if pre-booked transportation is unavailable from an offsite location to the **Show** venue.

    (iii)   **ADDITIONAL MARKETING EXPENSES** - This insurance will indemnify the insured for marketing **Expenses** including public relations and advertising costs of a rescheduled **Show** or if not rescheduled the corresponding or a similar **Show** that is held the following year. Such costs are in addition to the limit of liability.

    (iv)   **TERRORISM** – To indemnify the insured for any loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any act, threat or fear of **terrorism** (whether actual or perceived) regardless of any other cause contributing concurrently or in any sequence to the loss.

    (v)   **COMMUNICABLE DISEASE** - This insurance is to indemnify the insured for any loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any outbreak of communicable disease (whether actual or perceived) regardless of any other cause contributing concurrently or in any sequence to the loss.

## Section I Exclusions

1.   This insurance does not cover loss arising directly or indirectly as a result of any one or more of the following:

    a)   Lack of financial support of any kind;

    b)   Lack of or inadequate response, support or withdrawal of support by any party whose support is essential to the production of the **Show**;

    c)   Lack of or inadequate attendance or insufficient interest prior to the **Show**

unless in any of (a), (b), or (c) above caused by an event not otherwise excluded by this Insurance.

2.      This insurance does not cover loss arising directly or indirectly as a result of:

a)      The failure of the Insured to:

      i)      make all reasonable and necessary arrangements as the insured deems appropriate to ensure that the **Show** can be held on the scheduled date.

b)      Circumstances existing prior to the inception of insurance known by the Insured that could result in a loss unless the Insured had advised the **Company** of such circumstance and the **Company** accepted the particular risk by endorsement attached hereto and that any additional premium required has been paid by the Insured. For the purposes of this exclusion, Insured means the Risk Manager, CEO, CFO or General Counsel of the Named Insured.

c)      Non-appearance of an entertainer when their performance or engagement is the sole and principal purpose of the **Show**.

## Section II: Physical Loss to Personal Property

### Limit of Indemnity

Up to, but not exceeding $250,000 in all for each **Show**.

### Property Covered
All personal property owned, leased or rented by the Insured while in transit directly to or from the **Show** or while in use in connection with the **Show**.

### Risks Covered
All risks of direct physical loss or damage to property covered occurring during the period of the insurance and subject to the exclusions, conditions and applicable Limit of Indemnity stated in Part II above.

### Property Excluded

The following property is not covered:

    1      Property sold, leased, rented or loaned by the Insured to others after said property leaves the care, custody, ownership or control of the Insured;

    2      Vehicles licensed for use on the highway unless operated within the confines of the **Show** facility and the subject of or intended for display, exhibition or demonstration at the **Show**;

3    Money (which, for this Part II only means cash, bank notes, checks and other negotiable instruments, securities for money and stamps), jewellery, precious stones, and furs, unless such items are the subject intended for display, exhibition or demonstration at the **Show**.

## Section II Exclusions

This policy does not cover loss or damage caused by or arising from:

1.    Vermin, insects, inherent vice, latent defect, wear, tear or gradual deterioration, but this exclusion shall not apply to loss or damage caused by sprinkler leakage;

2.    Dishonesty on the part of the Insured, his employees or others to whom the property may be entrusted or delivered, but this exclusion shall not apply to loss or damage while the property is in the custody of common carriers;

3.    Inventory or stocktaking, shortage or unexplained disappearance or discrepancy;

4.    Processing, renovating, or repairing of property covered or faulty workmanship thereon, but if fire or explosion ensures causing loss or damage to property covered, this insurance shall only cover such ensuing physical loss or damages;

5.    Electrical or mechanical derangement or breakdown of property covered, but if fire or explosion ensures this exclusion shall not apply to direct loss or damage caused by such fire or explosion to property covered other than the property that has the electrical or mechanical derangement or breakdown.

6.    Loss of use, business **interruption**, extra expense or any other consequential loss.

## Section III: Door Registration Receipts

### Limit of Indemnity

Up to, but not exceeding $100,000 in all for each **Show**.

### Property Covered

"Money" meaning, for this Part III only, receipts paid in cash, bank notes, checks and other negotiable instruments at the **Show** facility for registration, or tickets for events directly associated with the **Show**.

### Risks Covered

All risks of direct physical loss of money at the **Show** facility and while directly in route to a bank in the vicinity occurring during the period of this insurance and subject to the exclusions, conditions and applicable Limit of Indemnity stated in Part II above.

### Section III Exclusions

This insurance does not cover:

1) Any loss when the registration desk or place where money is received is closed for business or temporarily unattended unless the money is in a locked safe and all safe keys have been removed and are in the custody of the Insured;
2) All claims not advised to the **Company** within thirty (30) working days of the date of loss;
3) Theft or dishonesty by any employee or any other person acting on behalf of the Insured;
4) Any loss when outside the **Show** facilities unless the money is accompanied by two able bodied persons;

## GENERAL EXCLUSIONS APPLICABLE TO ALL SECTIONS

1. *War and Civil War*

   Loss or damage directly or indirectly occasioned by, happening through, or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, or confiscation, or nationalization, or requisition, or destruction of or damage to property by or under the order of any government or public or local authority.

2. *Radioactive Contamination*

   Loss or damage arising directly or indirectly from nuclear reaction, nuclear radiation, or radioactive contamination regardless of any other cause or event that directly or indirectly contributes concurrently to or contributes in any sequence to the loss or damage even if such other cause or event would otherwise be covered. Nevertheless, if a fire arises directly from nuclear reaction, nuclear radiation, or radioactive contamination any loss or damage arising from that fire shall (subject to the provisions of this insurance) be covered, excluding, however, all loss or damage caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

3. *Nuclear, Biological or Chemical Materials*

   Loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with the actual or threatened malicious use of a nuclear weapon or device or of the actual or threatened malicious use of pathogenic or poisonous biological or chemical materials.

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7000957
Page 7

## GENERAL CONDITIONS AND WARRANTIES

1. *Concealment or Misrepresentation*

    This insurance is void and will immediately terminate if you intentionally conceal or misrepresent any material fact or circumstance relating to:

    - This insurance or the procurement thereof;

    - the **insured event**; or

    - Any claim made under this policy

    You will not be prejudiced by any unintentional or inadvertent omission, error or incorrect description of the exposures insured under this insurance.

    For the purpose of this Condition you means your Risk Manager, CFO, CEO or General Counsel or the person whose name and signature is attached to the application for this insurance.

2. *Subrogation Clause*

    The **Company** reserves the right to pursue an action for recovery after payment of a loss at their sole discretion and in the name of the Insured or otherwise unless the Insured has waived their right of subrogation as evidenced by a written contract executed prior to such loss. In the event of any payment under this insurance, the **Company** shall be subrogated to the extent of such payment to the insured's rights of recovery.

3. *Other Insurance Clause*

    This insurance is primary and non-contributory.

4. *Record Clause*

    The Insured shall keep an accurate record containing information and particulars of the **Show** or Meeting covered by this insurance to determine loss, damage or premium adjustment and will at all times that may be reasonable allow the **Company** or their representative to inspect or audit such information and particulars.

5. *Non Assignment Clause*

    This insurance may not be assigned in whole or in part without the written consent of the **Company**, such consent not to be unreasonable withheld.

6.    *Premium not an Expense Clause*

The premium paid on this policy is deemed not to be an expense in assessment of any claim hereunder.

7.    *Arbitration Clause*

If there are differences arising out of this Insurance and it is agreed by the Insured and the **Company** to arbitrate the differences, all differences arising out of this Insurance shall be referred to the decision of an Arbitrator to be appointed in writing by the parties in difference or if they cannot agree upon a single Arbitrator to the decision of two Arbitrators, one to be appointed in writing by each of the parties within 30 days after having been required in writing to do so by either of the parties. The two Arbitrators shall appoint an Umpire who shall sit with the Arbitrators and preside at their meetings. If the Arbitrators do not agree within 60 days of their appointment then the Umpire shall make the award within 60 days.

If the parties agree on an Arbitrator the cost will be split equally between the parties. If the parties cannot agree on a single Arbitrator then each party will be responsible for the cost of the Arbitrator they have selected and will split equally the cost of the Umpire.

8.    *Limit of Indemnity*

The **Company**'s Limit of Indemnity for loss or damage under this insurance is the applicable limit set forth in the Declarations.

9.    *Increase in Limits of Indemnity / Under-Insurance Clause*

It is understood and agreed that the Aggregate Limit of Indemnity is a loss limit and may not be sufficient to cover the aggregate value of all **Shows**. At any time prior to commencement of a **Show** or **Shows** the Insured can apply in writing for increased indemnity limits based upon revised financial estimates of **Gross Revenues, Expenses** or **Commitments**, provided that there is no circumstance(s) known by the insured which may give rise to a claim with respect to such **Show** or **Shows** declared to this insurance. Insured as used herein means the Risk Manager, CEO, CFO or General Counsel of the Named Insured.   It is understood and agreed that if **Gross Revenue, Expenses** or **Commitments** for any one, several or all **Shows** as per Item 7 of the Declarations increases in value by a factor of 10% there will be no change in premium and the Limit of Indemnity for any one, several or all **Shows** as per item 7 of the Declarations automatically increase accordingly. It is further agreed that any such change in value will automatically cause an increase in the Aggregate Limit of Indemnity as evidenced by Item 8 on the Declarations page.

10.    *Non Cancellation Clause*

This insurance cannot be cancelled by the **Company** except for non-payment of premium.

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19 7000957
Page 9

11.    *Conformity to Statute Clause-Conflict With State Amendatory Endorsement*

In the event there is any conflict between any state amendatory endorsement and other provisions contained in this Policy, the terms and provisions providing coverage which is most favourable to the **Insured** shall apply, to the extent permitted by law.

12.    *Reinstatement of Original Limit of Liability*

This Insurance is extended to cover a **Show** if it is Cancelled, Abandoned, Postponed, Interrupted, Curtailed or Relocated. The **Company** agrees to reinstate that part of the Limit of Indemnity shown in the Schedule utilized by way of any potential or actual Loss payment under this Insurance at the sole option of the Insured. If the Insured opts to reinstate the Limit of Indemnity then the additional premium payable is calculated at 100% of the original premium multiplied by that proportion of the Limit of Indemnity reinstated. Furthermore, if the Limit of Indemnity reinstated exceeds the ultimate settled Loss then the **Company** agrees to a return premium for the difference calculated in accordance with the foregoing. The maximum amount that can be reinstated shall not exceed $20,000,000.

13.    It is understood and agreed that this Insurance will extend to cover a Recurring **Show** scheduled to take place up to 90 days immediately following the expiration of the policy providing always that the loss occurs within the Policy Period and the event was previously insured under the policy.

## CLAIMS PROCEDURE

In the event of any happening or circumstance which could give rise to a claim under this Insurance the Insured shall:

1.    i)  as a matter of urgency give notice of the happening or circumstance to:

HCC Specialty Underwriters, Inc.
401 Edgewater Place, Suite 400
Wakefield, MA  01880
Phone:  (781) 994-6000
Fax:    (781) 994-6001

ii) confirm the facts of the claim in writing as soon as possible, with as much information as  available;

iii) provide the **Company** or their appointed representatives with:

a)      all necessary and reasonable assistance,
b)      documentation and records necessary to establish and assess indemnity hereunder,
c)      copies or extracts as may be requested in support of a claim.

iii) forward immediately to the **Company** or their representatives any letter, writ or other document received in connection with any claim made under this Insurance.

2.  The Insured as often as may be reasonably required shall submit to examination under oath on all matters connected with a claim, by any person named by the **Company** at such reasonable time and place as may be designated by the **Company** or their representatives.

    So far as is in their power the Insured shall cause their employees to comply with the foregoing.

    No such examination under oath or examination of books or documents, nor any other act of the **Company** or their representatives in connection with any investigation hereunder shall be deemed a waiver of any defense which the **Company** might otherwise have. All such examinations and acts shall be deemed to have been made or done without prejudice to the **Company**'s liability.

3.  As soon as is practicable and at the request of the **Company**, the Insured will render a signed and sworn Proof of Loss to the **Company** or their representative to substantiate the occurrence, nature, cause and amount of loss claimed under this Insurance

4.  It is understood and agreed that the loss adjuster will be Hyperion Claims Adjusters.

## DEFINITIONS

*Curtailment,*
*Cancellation,*
*Interruption,*
*Postponement,*
*Removal to Alternative Premises,*
*Abandonment*

> all mean the inability of the Insured to open, keep open, or otherwise maintain the Show in whole or in part for its original intent, scope and duration.

*"Gross Revenue"*     means the total of all revenue to the Insured from any and all source with respect to a Show including without limitation: exhibitor's fees; advance reservations; admissions; advertising; sponsorship.

Attaching to and forming part of
U.S. Specialty Insurance Company Policy No. U-19/7000957
Page 11

"*Expenses*"    means the total of all costs and charges incurred, committed or agreed by the Insured in organizing, running, maintaining, providing services and or otherwise to present or hold the Show.

"*Show*"    means conference, meeting, board meeting, show, exhibition, convention, exposition, trade show or any other Show which is insured under this insurance and includes installation and the dismantling of the Show during the period shown on the Declarations Page up to and including the date that the Insured vacates the venue.

"*Enforced Reduced Attendance*"    means some of the expected exhibitors, delegates, attendees or visitors being prevented from arriving at a Show solely and directly as a result of the same specific proximate cause, which is beyond their control and is not otherwise excluded.

*Insurance*
"*Effective Date*"    means the date shown in the declarations or the effective date of cover for any Show added by endorsement.

"*Deductible*"    means the amount shown on the Declarations page and which shall be deducted from the final gross adjusted loss payable to the Insured.

"*Company*"    means US Specialty Insurance Company.

"*Commitment(s)*"    mean the Insured's financial commitments unless they are released or discharged from such financial commitments, which are necessary for the operation or commencement of the Show and are intended to be discharged by a third party and which are agreed or committed prior to any incident which could give rise to a covered loss with respect to the Show.

"*Terrorism*"    means any act including without limitation, the use of force or violence or the threat or fear of such an act (whether actual or perceived) of or by any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and or to put the public or any section of the public in fear.

"*Emergency Transportation of Attendees*"    means the unplanned evacuation of attendees who need to be transported back to the Show venue from an off-site location due to an unexpected cause beyond the control of the insured and not otherwise excluded.

Gartner 2019 Events Scheduled Events
June 2019 - June 2020

| | Event Name | Event Date | city | country | venue | | Limit of Insurance |
|---|---|---|---|---|---|---|---|
| 2761 | CISO Exec Summit - UK EMEA | 6/18/2019 | London | UK | London Hilton on Park Lane | $ | 400,000 CD |
| 2461 | CMO Exec Summit - New York | 6/18/2019 | New York | USA | The Roosevelt Hotel | $ | 240,000 CD |
| 1680 | CIO Exec Summit - UK EMEA | 6/19/2019 | London | UK | London Hilton Park Lane | $ | 475,000 CD |
| 2914 | HR Leadership - New York II | 6/19/2019 | New York | USA | The Roosevelt Hotel | $ | 240,000 CD |
| 2762 | CHRO Exec Summit - UK EMEA | 6/20/2019 | London | UK | London Hilton on Park Lane | $ | 300,000 CD |
| 2692 | CIO Exec Summit - Dallas II | 6/24/2019 | Dallas | USA | Renaissance Dallas | $ | 550,000 CD |
| 2417 | CISO Exec Summit - Atanta | 6/24/2019 | Atlanta | USA | The St. Regis Atlanta | $ | 750,000 CD |
| 2726 | CISO Exec Summit - Dallas II | 6/25/2019 | Dallas | USA | Renaissance Dallas | $ | 720,000 CD |
| 2725 | CDO Exec Summit - Houston | 6/25/2019 | Houston | USA | The Post Oak Hotel | $ | 270,000 CD |
| 2449 | CXO Exec Summit - Miami | 6/25/2019 | Miami | USA | The Ritz Carlton Coconut Grove | $ | 700,000 CD |
| 2404 | CIO Exec Summit - Atlanta | 6/25/2019 | Atlanta | USA | The St. Regis Atlanta | $ | 720,000 CD |
| 2142 | CXO Exec Summit - Ohio | 6/25/2019 | Columbus | USA | The Westin Great Southern Columbus | $ | 720,000 CD |
| 2436 | CXO Exec Summit - Seattle | 6/26/2019 | Seattle | USA | Grand Hyatt Seattle | $ | 900,000 CD |
| 2403 | CIO Exec Summit - New York | 6/26/2019 | New York | USA | Pier Sixty at Chelsea Piers | $ | 950,000 CD |
| 2683 | CMO Exec Summit - Dallas | 6/26/2019 | Dallas | USA | Renaissance Dallas | $ | 700,000 CD |
| 2413 | CISO Exec Summit - Houston | 6/26/2019 | Houston | USA | The Post Oak Hotel | $ | 750,000 CD |
| 2733 | CHRO Exec Summit - Florida | 6/26/2019 | Miami | USA | The Ritz-Carlton Coconut Grove | $ | 230,000 CD |
| 2722 | CDO Exec Summit - Atlanta | 6/26/2019 | Atlanta | USA | The St. Regis Atlanta | $ | 290,000 CD |
| 2563 | HR Leadership - Seattle | 6/27/2019 | Seattle | USA | Grand Hyatt Seattle | $ | 375,000 CD |
| 2560 | HR Leadership - Dallas | 6/27/2019 | Dallas | USA | Renaissance Dallas | $ | 470,000 CD |
| 2400 | CIO Exec Summit - Houston | 6/27/2019 | Houston | USA | The Post Oak Hotel | $ | 960,000 CD |
| 2913 | HR Leadership - Atlanta II | 6/27/2019 | Atlanta | USA | The St. Regis Atlanta | $ | 275,000 CD |
| 2791 | CHRO Ldr Summit - Global I | 9/16/2019 | Westlake Village, CA | USA | Four Seasons Westlake Village | $ | 475,000 CD |
| 2773 | CXO Exec Summit - Sydney APAC | 9/24/2019 | Sydney | Australia | Sofitel Sydney Wentworth | $ | 330,000 CD |
| 2763 | CXO Exec Summit - Benelux EMEA | 10/1/2019 | Amsterdam | Netherlands | Hotel Okura | $ | 430,000 CD |
| 2443 | CXO Exec Summit - Pittsburgh | 10/9/2019 | Pittsburgh | USA | David L. Lawrence Convention Center | $ | 600,000 CD |
| 2444 | CXO Exec Summit - Phoenix | 10/11/2019 | Phoenix | USA | Pointe Hilton Tapatio Cliffs Resort | $ | 815,000 CD |
| 2448 | CXO Exec Summit - New Jersey | 10/30/2019 | New Jersey | USA | Hyatt Regency New Brunswick | $ | 730,000 CD |
| 2775 | CISO Exec Summit - Philly II | 11/5/2019 | Philadelphia | USA | Hilton Philadelphia at Penn's Landing | $ | 310,000 CD |
| 2421 | CISO Exec Summit - Dallas | 11/5/2019 | Dallas | USA | Hyatt Regency | $ | 750,000 CD |
| 2734 | CHRO Exec Summit - So California | 11/5/2019 | Los Angeles | USA | Sheraton Grand Los Angeles | $ | 470,000 CD |
| 2783 | LVT - CIO Exec Summit - Phily II | 11/6/2019 | Philadelphia | USA | Hilton Philadelphia at Penn's Landing | $ | 350,000 CD |
| 2408 | CIO Exec Summit - Dallas | 11/6/2019 | Dallas | USA | Hyatt Regency | $ | 850,000 CD |
| 2658 | CMO Exec Summit ? So California | 11/6/2019 | Los Angeles | USA | Sheraton Grand Los Angeles | $ | 215,000 CD |
| 2662 | CDO Exec Summit - Dallas | 11/7/2019 | Dallas | USA | Hyatt Regency | $ | 325,000 CD |
| 2738 | CISO Exec Summit - New York II | 11/12/2019 | New York | USA | New York Hilton Midtown | $ | 975,000 CD |
| 2122 | CISO Exec Summit - Detroit | 11/12/2019 | Detroit | USA | The Westin Book Cadillac | $ | 550,000 CD |
| 2661 | CDO Exec Summit - New York | 11/13/2019 | New York | USA | Convene at One Liberty Plaza | $ | 360,000 CD |
| 2711 | CIO Exec Summit - New York II | 11/13/2019 | New York | USA | New York Hilton Midtown | $ | 875,000 CD |
| 2409 | CIO Exec Summit - Detroit | 11/13/2019 | Detroit | USA | The Westin Book Cadillac | $ | 815,000 CD |
| 2565 | HR Leadership - New York | 11/14/2019 | New York | USA | Convene at One Liberty Plaza | $ | 450,000 CD |
| 2569 | HR Leadership - Detroit | 11/14/2019 | Detroit | USA | The Westin Book Cadillac | $ | 230,000 CD |
| 2447 | CXO Exec Summit - Washington DC | 11/19/2019 | Washington | USA | Marriott Marquis, Washington | $ | 745,000 CD |
| 2442 | CXO Exec Summit - Charlotte | 11/19/2019 | Charlotte | USA | The Westin Charlotte | $ | 770,000 CD |
| 2748 | HR Leadership - Denver | 11/19/2019 | Denver | USA | The Westin Denver Downtown | $ | 230,000 CD |
| 2567 | HR Leadership - Washington DC | 11/20/2019 | Washington | USA | Marriott Marquis, Washington | $ | 450,000 CD |
| 2562 | HR Leadership - Charlotte | 11/20/2019 | Charlotte | USA | The Westin Charlotte | $ | 450,000 CD |
| 2420 | CISO Exec Summit - Boston | 11/20/2019 | Boston | USA | Westin Copley Place | $ | 720,000 CD |
| 2407 | CIO Exec Summit - Boston | 11/21/2019 | Boston | USA | Westin Copley Place | $ | 695,000 CD |
| 2764 | CISO Exec Summit - DACH EMEA | 11/26/2019 | Frankfurt | Germany | Hilton Frankfurt City Centre | $ | 440,000 CD |
| 0022 | CIO Exec Summit - DACH EMEA | 11/27/2019 | Frankfurt | Germany | Hilton Frankfurt City Centre | $ | 450,000 CD |
| 2735 | CISO Exec Summit - Chicago II | 12/3/2019 | Chicago | USA | Chicago Marriott Downtown Magnificent Mile | $ | 800,000 CD |

P 14141

| | | | | |
|---|---|---|---|---|
| 2774 - CXO Exec Summit - Melbourne APAC | 12/3/2019 Melbourne | Australia | Grand Hyatt Melbourne | $ 280,000.00 |
| 2440 - CXO Exec Summit - Calgary | 12/4/2019 Calgary | Canada | BMO Centre at Calgary Stampede | $ 450,000.00 |
| 2411 - CIO Exec Summit - Chicago | 12/4/2019 Chicago | USA | Chicago Marriott Downtown Magnificent Mile | $ 975,000.00 |
| 2441 - CXO Exec Summit - St. Louis | 12/4/2019 St. Louis | USA | The Chase Park Plaza | $ 600,000.00 |
| 2568 - HR Leadership - Atlanta | 12/4/2019 Atlanta | USA | The Westin Buckhead | $ 425,000.00 |
| 2741 - CXO Exec Summit - Florida II | 12/5/2019 Miami | USA | Loews Miami Beach Hotel | $ 440,000.00 |
| 2657 - CMO Exec Summit ? Atlanta | 12/5/2019 Atlanta | USA | The Westin Buckhead | $ 200,000.00 |
| 2737 - CISO Exec Summit - Houston II | 12/9/2019 Houston | USA | JW Marriott Houston by the Galleria | $ 475,000.00 |
| 2685 - CMO Exec Summit - Seattle | 12/10/2019 Seattle | USA | Grand Hyatt Seattle | $ 200,000.00 |
| 2788 - CISO Exec Summit - Minneapolis II | 12/10/2019 Minneapolis | USA | Hilton Minneapolis | $ 335,000.00 |
| 2570 - HR Leadership - Toronto | 12/10/2019 Toronto | Canada | Hilton Toronto Downtown | $ 455,000.00 |
| 2565 - HR Leadership - Houston | 12/10/2019 Houston | USA | JW Marriott Houston by the Galleria | $ 440,000.00 |
| 2696 - CIO Exec Summit - Houston II | 12/10/2019 Houston | USA | JW Marriott Houston by the Galleria | $ 600,000.00 |
| 2740 - CXO Exec Summit - So Cal II | 12/10/2019 Los Angeles | USA | Sheraton Grand Los Angeles | $ 700,000.00 |
| 2743 - CXO Exec Summit - Seattle II | 12/11/2019 Seattle | USA | Grand Hyatt Seattle | $ 850,000.00 |
| 2781 - CIO Exec Summit - Minneapolis II | 12/11/2019 Minneapolis | USA | Hilton Minneapolis | $ 350,000.00 |
| 2729 - COO Exec Summit - Toronto | 12/11/2019 Toronto | Canada | Hilton Toronto Downtown | $ 240,000.00 |
| 2719 - CIO Exec Summit - So California II | 12/11/2019 Los Angeles | USA | Sheraton Grand Los Angeles | $ 720,000.00 |
| 2726 - CUO Exec Summit - Minneapolis | 12/12/2019 Minneapolis | USA | Hilton Minneapolis | $ 240,000.00 |
| 2779 - CIO Exec Summit - Atlanta II | December Atlanta | USA | TBD | $ 400,000.00 |
| 2785 - CISO Exec Summit - Atlanta II | December Atlanta | USA | TBD | $ 450,000.00 |
| 2458 - CMO Exec Summit - Chicago | December Chicago | USA | TBD | $ 240,000.00 |
| 2663 - COO Exec Summit - Chicago | December Chicago | USA | TBD | $ 345,000.00 |
| 2439 - CISO Exec Summit - Milwaukee | December Milwaukee | USA | TBD | $ 555,000.00 |
| 2410 - CIO Exec Summit - San Francisco | December San Francisco | USA | TBD | $ 820,000.00 |
| 2423 - CISO Exec Summit - San Francisco | December San Francisco | USA | TBD | $ 750,000.00 |
| 2727 - COO Exec Summit - San Francisco | December San Francisco | USA | TBD | $ 335,000.00 |
| 2412 - CIO Exec Summit - Toronto | December Toronto | Canada | TBD | $ 575,000.00 |
| 2425 - CISO Exec Summit - Toronto | December Toronto | Canada | TBD | $ 615,000.00 |
| 2760 - CXO Exec Summit Nordics EMEA | 4/4/2020 Stockholm | Sweden | Sheraton Stockholm | $ 430,000.00 |
| 2786 - CISO Exec Summit - Boston II | 5/7/2020 Boston | USA | InterContinental Bosto | $ 550,000.00 |
| 2780 - CIO Exec Summit - Boston II | 5/8/2020 Boston | USA | InterContinental Bosto | $ 400,000.00 |
| 2789 - CISO Exec Summit - Toronto II | 5/13/2020 Toronto | Canada | Metro Toronto Convention Centre | $ 480,000.00 |
| 2424 - CISO Exec Summit - Chicago | 5/14/2020 Chicago | USA | Hyatt Regency McCormick Place | $ 825,000.00 |
| 2690 - CIO Exec Summit - Chicago | 5/15/2020 Chicago | USA | Hyatt Regency McCormick Place | $ 600,000.00 |
| 2739 - CISO Exec Summit - San Fran II | 5/15/2020 San Francisco | USA | The Westin St. Francis | $ 850,000.00 |
| 2556 - HR Leadership - Chicago | 5/16/2020 Chicago | USA | Hyatt Regency McCormick Place | $ 385,000.00 |
| 2419 - CISO Exec Summit - Minneapolis | 5/21/2020 Minneapolis | USA | Minneapolis Marriott City Center | $ 675,000.00 |
| 2744 - CXO Exec Summit - Washington DC II | 5/22/2020 Washington | USA | Marriott Marqua, Washington | $ 650,000.00 |
| 2466 - CIO Exec Summit - Minneapolis | 5/22/2020 Minneapolis | USA | Minneapolis Marriott City Center | $ 700,000.00 |
| 2795 - CHRO Ldr Summit - Sydney APAC | 5/22/2020 Sydney | Australia | Sofitel Sydney Wentworth | $ 280,000.00 |
| 2431 - CXO Exec Summit - Vancouver | 5/22/2020 Vancouver | Canada | Vancouver Marriott Pinnacle Downtown | $ 675,000.00 |
| 2730 - CXO Exec Summit - Washington DC II | 5/23/2020 Washington | USA | Marriott Marquis, Washington | $ 290,000.00 |
| 2558 - HR Leadership - Minneapolis | 5/23/2020 Minneapolis | USA | Minneapolis Marriott City Center | $ 460,000.00 |
| 2557 - HR Leadership - Vancouver | 5/23/2020 Vancouver | Canada | Vancouver Marriott Pinnacle Downtown | $ 275,000.00 |
| 2415 - CISO Exec Summit - So California | 6/4/2020 Universal City, CA | USA | Hilton Los Angeles/ Universal City | $ 900,000.00 |
| 2414 - CIO Exec Summit - Philadelphia | 6/4/2020 Philadelphia | USA | Hilton Philadelphia at Penn's Landing | $ 530,000.00 |
| 2561 - HR Leadership - Boston | 6/4/2020 Boston | USA | Hyatt Regency | $ 450,000.00 |
| 2724 - CDO Exec Summit - Detroit | 6/4/2020 Detroit | USA | MGM Grand | $ 220,000.00 |
| 2402 - CIO Exec Summit - So California | 6/5/2020 Universal City, CA | USA | Hilton Los Angeles/ Universal City | $ 960,000.00 |
| 2401 - CIO Exec Summit - Philadelphia | 6/5/2020 Philadelphia | USA | Hilton Philadelphia at Penn's Landing | $ 700,000.00 |
| 2723 - CIO Exec Summit - Boston | 6/5/2020 Boston | USA | Hyatt Regency | $ 280,000.00 |
| 2787 - CISO Exec Summit - Detroit | 6/5/2020 Detroit | USA | MGM Grand | $ 350,000.00 |
| 2728 - CDO Exec Summit - So California | 6/6/2020 Universal City, CA | USA | Hilton Los Angeles/ Universal City | $ 325,000.00 |
| 2554 - CHRO Leadership - Philadelphia | 6/6/2020 Philadelphia | USA | Hilton Philadelphia at Penn's Landing | $ 385,000.00 |
| 2682 - CMO Exec Summit - Detroit | 6/6/2020 Boston | USA | Hyatt Regency | $ 240,000.00 |
| 2437 - CXO Exec Summit - Indianapolis | 6/6/2020 Indianapolis | USA | JW Marriott Indianapolis | $ 455,000.00 |
| 2750 - CIO Exec Summit - Detroit II | 6/6/2020 Detroit | USA | MGM Grand | $ 385,000.00 |
| 2435 - CXO Exec Summit - Denver | 6/11/2020 Denver | USA | The Westin Denver Downtown | $ 850,000.00 |
| 2717 - CIO Exec Summit - San Francisco I | 6/11/2020 San Francisco | USA | The Westin St. Francis | $ 725,000.00 |
| 2555 - CHRO Leadership - San Francisco | 6/12/2020 San Francisco | USA | The Westin St. Francis | $ 375,000.00 |
| 2684 - CMO Exec Summit - San Francisco | 6/13/2020 San Francisco | USA | The Westin St. Francis | $ 700,000.00 |
| | | | Total: | $ 58,545,000.00 |

Aggregate Limit of Insurance $   20,000,000.00

**ENDORSEMENT NUMBER**          **1**

**Attaching to and forming part of U.S. Specialty Insurance Company Policy No.  U-19/7000957**

Assured:          Gartner Group, Inc.

It is hereby noted and agreed that:


SANCTION LIMITATION AND EXCLUSION CLAUSE

No insurer shall be deemed to provide cover and no insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

15/09/10

LMA3100


All other terms and conditions remain unchanged.


**Additional Premium:**          N/A
**Return Premium:**          N/A
**Effective Date:**          June 15, 2019
**Date of Issue:**          June 24, 2019


U.S. SPECIALTY INSURANCE COMPANY

By

Authorized Representative

2-14141

ENDORSEMENT NUMBER          2

Attaching to and forming part of U.S. Specialty Insurance Company Policy No.  U-19/7000957

Assured:          Gartner Group, Inc.

It is hereby noted and agreed that:

U.S. Terrorism Risk Insurance Act, as amended in 2015
New & Renewal Business Endorsement

*This Endorsement is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act, as amended in 2015", as summarized in the disclosure notice.*

In consideration of an additional premium of USD $27,646.40 for certified acts of terrorism and $6,911.60 for non-certified acts of terrorism paid, it is hereby noted and agreed with effect from inception that the Terrorism exclusion to which this Insurance is subject, shall not apply to any "insured loss" directly resulting from any "act of terrorism" as defined in the U.S. Terrorism Risk Insurance Act of 2015, as amended (TRIA).

The coverage afforded by this Endorsement is only in respect of any "insured loss" of the type insured by this Insurance directly resulting from an "act of terrorism" as defined in TRIA.  The coverage provided by this Endorsement shall expire at 12:00 midnight December 31, 2020, the date on which the TRIA Program is scheduled to terminate, or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates.  The Terrorism exclusion, to which this Insurance is subject, applies in full force and effect to any other losses and any act or events that are not included in said definition of "act of terrorism".

This Endorsement only affects the Terrorism exclusion to which this Insurance is subject.  All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

Furthermore the Underwriter(s) will not be liable for any amounts for which they are not responsible under the terms of TRIA (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on the Underwriter's liability for payment for terrorism losses.
**All other terms and conditions remain unchanged.**

Effective Date:               June 15, 2019
Date of Issue:               June 24, 2019

U.S. SPECIALTY INSURANCE COMPANY

By        _____
                 **Authorized Representative**

2-14141

TRIA SPECIALTY ENDORSEMENT 2 (11/15)